**TOWN OF COVENTRY ZONING
BOARD OF REVIEW**

v.

**OMNI DEVELOPMENT
CORPORATION.**

No. 2002–20–Appeal.

Supreme Court of Rhode Island.

Jan. 30, 2003.

Patrick J. Sullivan, Coventry, for Plaintiff.

Scott T. Spear, North Scituate, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This is a case of first impression. The Supreme Court shall pass upon the provisions of The Rhode Island Low and Moderate Income Housing Act and the authority of the State Housing Appeals Board to decide appeals brought pursuant to the act. The plaintiff, the Zoning Board of Review of the Town of Coventry (plaintiff or Coventry), is before the Supreme Court on appeal from a decision by the State Housing Appeals Board (SHAB) in favor of the defendant, Omni Development Corporation (defendant or Omni), that granted relief from provisions of Coventry's zoning and subdivision regulations in connection with a proposed residential subdivision. On February 22, 2001, Omni submitted an application for a special exception (application) to Coventry pursuant to the Rhode Island Low and Moderate Income Housing Act, G.L. 1956 chapter 53 of title 45(act). Omni planned to construct a residential cluster development, which is a permitted use under the town's zoning and subdivision ordinances. The act is designed to promote the development of low and moderate income housing opportunities in each city and town in the state. Although § 45–53–2 of the act provides that "an equal consideration shall be on retrofitting existing dwellings and assimilating low and moderate income housing into existing developments and neighborhoods[,]" and is silent with respect to residential subdivision proposals, Omni sought approval for a forty-three-lot residential subdivision for an undeveloped parcel of land. As part of

its application, Omni requested relief from several provisions of the town's subdivision and zoning ordinances. After a series of hearings, Coventry approved the application and granted some, but not all, of the relief requested by Omni. Omni turned to SHAB for the remainder of its requested relief. Coventry has appealed to this Court.

### Low and Moderate Income Housing

In an effort to promote increased housing opportunities for people with low and moderate incomes, § 45–53–4 of the act provides for a streamlined and expedited application procedure whereby "a single application for a special exception to build [low and moderate income] housing in lieu of separate applications to the applicable local [municipal] boards" may be submitted to the zoning board of review of a city or town by any public agency, nonprofit organization, or limited equity housing cooperative proposing to build low and moderate income housing.[1] The act requires that the zoning board of review notify each local board of the application, and conduct a public hearing within thirty days of the receipt of the application. A decision by a majority of the board shall be made within forty days after the public hearing ends. The act vests the zoning board of review with "the same power to issue permits or approvals [as] any local board or official who would otherwise act with respect to the application" enjoys, including "the power to attach to the permit or approval, conditions, and requirements with respect to height, site plan, size, or shape, or building materials * * *." Id.

Omni proposed to develop forty-three single-family homes on an undeveloped parcel of land[2] in the town of Coventry. The project involved the construction of a subdivision composed of twenty affordable single-family homes for families with low and moderate income and twenty-three market-rate dwellings priced for first-time home buyers in accordance with the guidelines promulgated by the Rhode Island Housing and Mortgage Finance Corporation. The proposed development is in an R–20 zone, which permits single-family homes on lots with no less than 20,000 square feet. Pursuant to Article IV of the Town of Coventry's Subdivision and Land Development Regulations (subdivision regulations), Omni proposed building a residential cluster development, a subdivision composed of smaller house lots in exchange for a greater expanse of open land, while maintaining the same density as a conventional subdivision. Significantly, Art. IV, § A3 of the town's subdivision regulations requires that land deemed unsuitable for development and land designated as street rights-of-way be subtracted from the total acreage of the parcel before a density calculation for a residential cluster development is finalized. The remaining acreage then is divided by the minimum lot size for standard subdivision lots in the zoning district where the parcel is located. The resulting figure is the maximum number of dwelling units permitted in the residential cluster development.

In this case, Omni presented a development proposal to Coventry that reflected a

1. General Laws 1956 § 45–53–4, as amended by P.L. 2002, ch. 416, § 1, permits low and moderate income housing proposals by private developers for dwellings that must remain as low and moderate income housing for a period of not less than thirty years from initial occupancy.

2. The property, known as the DeGraide Farm, is composed of 40.33 acres. According to Omni, the parcel is divided by a utility easement and is accessible by two "stub streets" and by an unimproved road that provides secondary access to a neighboring development.

net profit of $3,074, and included a request for relief from several subdivision regulations and the fair-share development fee ordinance that requires an impact fee upon each new dwelling unit constructed in the town. Omni's president testified that without the requested waivers the total additional development costs would equal $362,968, a figure in excess of the anticipated net profit. Accordingly, Omni argued that for the proposed project to be economically viable, relief from the following requirements of the Town of Coventry Zoning Ordinances and subdivision regulations was necessary:

(1) Above ground utility lines in place of underground lines;

(2) Asphalt berms in place of vertical face granite or concrete curbs;

(3) Exemption from impact fees of .$7,596 per unit;

(4) Exemption from constructing a bicycle path in the development;

(5) Exemption from constructing two separate means of ingress and egress by means of vehicular access streets; instead Omni proposed a single access roadway into the project and two "secondary access roads" for emergency use only and not for regular vehicular traffic; and

(6) Construction of a cul-de-sac 600 feet longer than the 800 feet permitted by the regulation.

On July 19, 2001, after a series of public hearings, Coventry voted to approve the application but denied relief from the subdivision regulations that require vertical face curbing and a secondary access road into the development. The approval required Omni to expand the width of an existing bridge on the southeast corner of the plan to a thirty-foot paved width (with two travel lanes for full roadway access). In addition, Omni was relieved of development impact fees of $7,596 on each low and moderate income unit, but not for the market-rate dwellings. Further, Coventry found that Omni had failed to submit the forms and documents required for review of issues ordinarily determined by other boards and commissions, including a final plan illustrating all public improvements or lot lines. In light of these deficiencies, Omni was required to reconfigure the lot lines in the development so that each lot was at least 15,000 square feet, without including land deemed unsuitable for development. Coventry granted defendant's request for waivers for underground utilities and a bicycle path, and granted defendant's request to construct a 1,400 foot cul-de-sac, 600 feet longer than allowable by regulation.

The defendant appealed the decision to SHAB and argued that the conditions and requirements contained in plaintiff's approval rendered the proposed project economically infeasible and that the decision was inconsistent with local needs. The SHAB reviewed plaintiff's approval pursuant to § 45–53–6 of the act and voted as follows:

"1. Vertical face curbs are not necessary for the health and safety of the occupants of the proposed housing or of the residents of the [t]own; are not necessary for the protection of the environment; are not consistent with local needs; and the cost creates an unnecessary restriction on affordability.

"2. The reconfiguring of the lot lines is not necessary for the health and safety of the occupants of the proposed housing or of the residents of the [t]own; is not necessary for the protection of the environment; is not consistent with local needs; and that the cost creates an unnecessary restriction on affordability.

"3. Widening the existing bridge to create a second full roadway access into the project is not necessary for the

health and safety of the occupants of the proposed housing or of the residents of the [t]own; is not necessary for the protection of the environment; is not consistent with local needs; and the cost creates an unnecessary restriction on affordability.

. "4. The Zoning Board's imposition of impact fees on the 23 market rate units makes the project economically infeasible and is overruled on the condition that any profit over the projected $3,074 (as certified by Rhode Island Housing's cost certification process) be turned over to the Town of Coventry to be administered by the same rules and regulations as the Community Development Block Grant and be used for moderate rehabilitation; and further, that the sales price of the market rate houses be in accordance with Rhode Island Housing's first-time home buyer program as it exists at the time of sale."

Further, because of concerns about development approval from agencies over which Coventry has no jurisdiction, SHAB voted to retain jurisdiction of this project. The plaintiff has appealed.

## Standing

■■■ Although the issue of standing has not been raised by Omni, "[t]his question [is] of such overriding importance as to be raised *sua sponte* by us." *DeCesare v. Board of Elections*, 104 R.I. 136, 141, 242 A.2d 421, 423–24 (1968) (holding that even though parties had not orally argued or briefed the issue of standing, the Supreme Court could raise the issue *sua sponte*, and concluding that members of a local board of canvassers were not aggrieved parties, and thus lacked standing to seek or obtain judicial relief in an elections dispute). (Emphasis added.) We are cognizant that the appellant in this case is the Town of Coventry Zoning Board of Review. Section 45–53–5 of the act provides that SHAB's decisions and orders "may be appealed in the [S]upreme [C]ourt" but it sets forth no standing requirement. In contrast, an appeal to this Court of a zoning board decision that granted a special exception for low and moderate income housing may be undertaken by "[a]ny person aggrieved by the issuance of an approval[.]" Section 45–53–4. Therefore, in order to obtain review of a zoning board decision that approved a special exception for low and moderate housing by the zoning board, the appeal must be taken by an aggrieved person who has an actual stake in the outcome of the controversy. This Court has repeatedly held that a zoning board has no standing to seek judicial review of an adverse decision of the Superior Court reversing or modifying its decisions. *See Kirby v. Planning Board of Review of Middletown*, 634 A.2d 285, 288 n.3 (R.I.1993) (and cases cited therein). "Basically and fundamentally a zoning board is an administrative body whose duties are quasi-judicial." *Hassell v. Zoning Board of Review of East Providence*, 108 R.I. 349, 351, 275 A.2d 646, 648 (1971). A zoning board of review, as a statutory creation, "is without powers, rights, duties or responsibilities save for those conferred upon it by the Legislature." *Id.* at 352, 275 A.2d at 648. A zoning board is charged with enforcement of zoning legislation and deciding applications for variances and special exceptions. Significantly, review of Superior Court zoning decisions by this Court is by way of certiorari and we have held that a zoning board of review has no legal standing to ask this Court to issue its prerogative writ of certiorari to review a decision of the Superior Court. *Id.* at 352–53, 275 A.2d at 648. Although no such standing requirement is set forth in § 45–53–5 of the act (permitting an appeal to the Supreme Court from SHAB's decisions and orders),

we are of the opinion that aggrievement remains a fundamental prerequisite for a party to possess the requisite standing to obtain judicial review of SHAB decisions and orders. " 'Aggrievement,' moreover, is no less a jurisdictional prerequisite to certiorari than it is to an appeal." *DeCesare*, 104 R.I. at 147 n. 1, 242 A.2d at 426 n.1 (Joslin, J. whom Kelleher, J. joins concurring in part and dissenting in part).

■■■■ According to the provisions of the act, a zoning board, when passing upon an application for a special exception for low and moderate income housing, is not merely performing its limited statutory duties, but rather is vested with significant discretion and responsibility to act in the best interest of the community. In considering an application for a special exception to construct low and moderate income housing, the zoning board is vested with the same power and authority as the various local boards, including the city or town council. However, notwithstanding the zoning board's significant authority with respect to proposals for the development of low and moderate income housing opportunities and the fact that the zoning board's responsibilities continue long after its initial approval of the subdivision, we are not satisfied that the zoning board has sufficient standing to prosecute this appeal. Rather, "challenges to reversals of zoning-board decisions must be made by those whose land use will be affected by the decision or by a city or town solicitor acting on the public's behalf." *Kirby*, 634 A.2d 288–89 n.3. In light of the interest of the entire community in appropriate land development and our decision to remand this case to SHAB, the town council, acting through its solicitor, may, within thirty days of the date of this decision intervene as a party before this Court, at which point the case shall be remanded to SHAB for further findings. *See Town of East Greenwich v. Day*, 119 R.I. 1, 3, 375 A.2d 953, 954 (1977) (mere fact "[t]hat a municipality may have first invoked judicial assistance at this, rather than at [a lower] level of a zoning dispute * * * in no way eradicates or even minimizes the threat that a decision in a zoning dispute may pose to the public interest * * *"). If the town fails to do so, however, we shall deny and dismiss the appeal because the zoning board lacks the requisite standing to invoke our jurisdiction over SHAB's orders and decisions. Nevertheless, with respect to the rest of our opinion, we shall assume that the town will intervene as a party, and we proceed to resolve the questions presented in this appeal.

## Issues

Coventry has raised several issues for our consideration. First, Coventry challenges whether the act applies to residential subdivision applications or is limited to multifamily construction projects. Further, Coventry asserts that the standard of review applicable to SHAB decisions is analogous to that applied by the Superior Court in considering appeals from local zoning boards of review pursuant to G.L. 1956 § 45–24–69. Coventry also challenges the decision on the ground that SHAB failed to evaluate the evidence in light of the standards set forth in § 45–53–6, including whether Coventry's decision was consistent with the town's comprehensive plan; that SHAB failed to consider the health and safety of its residents, including the residents of the subdivision; and failed to determine whether Coventry's decision rested, in part on the need to preserve open space. Coventry also alleges that SHAB failed to find, as required by the act, whether Coventry applies its zoning ordinances and subdivision regulations evenhandedly for both subsidized and unsubsidized housing applications. Finally,

Coventry maintains that SHAB has no authority to relieve Omni from the imposition of development impact fees for market-rate homes, notwithstanding its determination that the fees make the construction of the housing infeasible.

## Standard of Review

 Coventry has urged this Court to adopt as a standard of review for SHAB to apply when passing on an appeal from a zoning board decision, the same standard of review that this Court utilizes in reviewing zoning decisions of the Superior Court pursuant to § 45–24–69. In support of its argument, Coventry cites this Court's decision in *Curran v. Church Community Housing Corp.*, 672 A.2d 453, 454 (R.I. 1996), in which we recognized that no standard of review was specifically provided for in chapter 53 of title 45 and held that *our* standard of review was "analogous to that applied by the Superior Court in considering appeals from local zoning boards of review pursuant to G.L.1956 § 45–24–69 * * *." *Curran*, 672 A.2d at 454. A SHAB decision may be reversed by this Court if it violates constitutional or statutory provisions, was made in excess of statutory authority or upon error of law, or was otherwise clearly erroneous in view of the evidence or was otherwise arbitrary or capricious. *Id.* at 454–55. This standard of review applies to this Court's review of SHAB's decisions, but is not the standard SHAB must employ when hearing appeals from local zoning boards that grant or deny a special exception for low and moderate income housing. That standard of review, we are satisfied, is explicitly set forth in the statute. Section 45–53–6(a) provides:

"**Power of state housing appeals board.**—(a) In hearing the appeal, the state housing appeals board shall determine whether, in the case of the denial of an application, the decision of the zoning board of review was reasonable and consistent with local needs and, in the case of an approval of an application with conditions and requirements imposed, whether those conditions and requirements make the construction or operation of the housing infeasible and whether they are consistent with local needs."

 In order for SHAB to overturn or modify a decision of a zoning board that denied an application, it must determine whether the denial was reasonable and consistent with local needs. In cases in which the zoning board approved an application but imposed certain conditions and requirements, SHAB must determine whether the decision of the zoning board of review "makes the building or operation of the housing infeasible, and is not consistent with local needs * * *." Section 45–53–6(c). The terms "infeasible" and "not consistent with local needs" have particular significance to our discussion. A zoning decision denying an application or an approval with conditions and requirements can be found to be consistent with local needs in two distinct situations. First, a zoning or land use ordinance, requirement, or regulation is consistent with local needs when it is imposed by a city or town council after a "comprehensive hearing," [3] and that community has met or exceeded its statutory minimum for low and moderate income housing units; [4] and has

---

3. The term "comprehensive hearing" is not defined by the statute; we deem this to mean a public hearing convened for purposes of adopting or amending local land use legislation.

4. In the case of Coventry and other communities that have fewer than 5,000 occupied rental units, the minimum number of low and moderate income units must be more than 10 percent of the total housing units reported in

adopted a comprehensive plan that includes a housing element that addresses the need for low and moderate income housing for that community. With respect to these communities, the Legislature conclusively has determined that any zoning or land use ordinance that is properly enacted is consistent with local needs. Thus, in cases of a denial of a development proposal by these communities, SHAB has no authority to vacate that decision. Moreover, in these communities, SHAB may not vacate, modify, or reverse a decision or remove any conditions or requirements attached to an approval that are consistent with local needs, "notwithstanding that the decision or conditions and requirements have the effect of denying or making the applicant's proposal infeasible." Section 45–53–6(c).

■ In cities and towns that fall short of the statutory quota for low and moderate income housing units, land use ordinances and requirements are not conclusively deemed consistent with local needs. Rather, the definition of "consistent with local needs" for zoning ordinances and land use regulations for communities that fall short of the statutory minimum is set forth in § 45–53–3(2) as follows:

" 'Consistent with local needs' means local zoning or land use ordinances, requirements, and regulations are considered consistent with local needs if they are reasonable in view of the state need for low and moderate income housing, considered with the number of low income persons in the city or town affected and the need to protect the health and safety of the occupants of the proposed housing or of the residence [sic] of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces, and if the local zoning or land

use ordinances, requirements, and regulations are applied as equally as possible to both subsidized and unsubsidized housing."

■ In these municipalities, it is incumbent upon SHAB to examine the decision *and* the ordinance or regulation on which it rests and determine whether the regulation or ordinance is reasonable in light of the state's need for low income housing, the number of low income persons residing in that particular community *and* the need to protect the health and safety of the community as a whole *or* "to promote better site and building design in relation to the surroundings, *or* to preserve open spaces." *Id.* (Emphasis added.) An ordinance or regulation is reasonable if it is not designed or intended to exclude low and moderate income residents from the community or to discourage or frustrate the likelihood of success of a project. The ordinance or regulation must be "applied as equally as possible to both subsidized and unsubsidized housing" *id.*, and must relate to health and safety, better building design, or the preservation of open space. These criteria must be weighed against the state's need for low and moderate income housing and the number of low income residents in the community. In sum, SHAB must examine the regulation or ordinance in light of these criteria, decide whether the ordinance or regulation is consistent with local needs, and set forth the evidence it relied upon in reaching this conclusion and resolve any disputed issues of fact.

■ Therefore, in communities, including the Town of Coventry, that do not have the established minimum number of low and moderate income housing units, a zoning or land use requirement or regula-

the latest decennial census. Section 45–53–3(2)(i)(B).

tion ·may be found to be consistent with local needs if it is reasonable in light of the state's need for low and moderate income housing and of the number of low income persons in the community, and if it relates to health and safety, better building design, or preservation of open space. It must be applied evenhandedly to all development proposals and not intended to frustrate or defeat low and moderate income housing initiatives.· Only upon a finding that a particular ordinance or regulation fails to meet these .criteria, may SHAB declare that it is not consistent with local needs. Thus, SHAB's first order of business is to examine the zoning and land use regulations and ordinances upon which the zoning board's decision rests and the community's comprehensive plan to determine whether the regulations are consistent with local needs. If. the regulation is found to be consistent with local needs, the inquiry is ended and a decision based upon that regulation may not be "vacated, modified or removed by [SHAB] notwithstanding that the decision or conditions and requirements have the effect of denying or making the applicant's proposal ·infeasible." Section 45–53–6(c).

Furthermore, in cases of an approval of an application "with conditions and requirements imposed," SHAB must determine whether the conditions and requirements make the construction of the project infeasible and whether the conditions and requirements are consistent with local needs. The term "infeasible" is defined in § 45–53–3(3) as follows:

" 'Infeasible' means any . condition brought about by any single factor or combination of factors, as a result of limitations imposed on the development

by conditions attached to the zoning approval, to the extent that it makes it impossible for a public agency, nonprofit organization, or limited equity housing cooperative to proceed in building or operating low or moderate income housing without financial loss, within the limitations set by the subsidizing agency of government, on the size or character of the development, on the amount or nature of the subsidy, or on the tenants, rentals, and income permissible, and without substantially changing the rent levels and unit sizes proposed by the public agency, nonprofit organization, or ·limited equity housing cooperative."

 By clear and unequivocal language, the Legislature had determined that a project is deemed "infeasible" when the conditions attached to the zoning approval render it *impossible* to proceed without financial loss, within the limitations set by the subsidizing agency of government. The term "impossible" is defined as, "1. not possible; unable to be, exist, [or] happen, etc. 2. unable to be done." Random House Unabridged Dictionary 962 (2nd ed. 1993). It is incumbent upon the party challenging the zoning board decision to demonstrate to the satisfaction of SHAB that the conditions and requirements make it impossible for the developer to proceed without financial loss and there are no alternative measures or modifications that can be accomplished to render construction of the project viable and capable of success. This burden of proof necessarily entails full disclosure of the financial plans that underlay the project, including accurate cost projections and the anticipated price of the homes.[5]

5. During the SHAB hearing, members of the board inquired about the price range for the market-price homes in light of their understanding that the purchase price could be increased in accordance with the program

guidelines. Although critical to a finding that the conditions and requirements rendered the project infeasible, these questions were never answered. Further, there was conflicting evidence introduced relative to the cost of the

Finally, § 45–53–6(b) sets forth certain standards that SHAB must consider in making these findings. Although these standards mirror the definition of "consistent with local needs," SHAB must examine the decision in light of the community's comprehensive plan and determine whether the decision is consistent with the comprehensive plan and also consider the remaining factors set forth in § 45–53–6(b):

"The standards for reviewing the appeal include, but are not limited to:

(1) The consistency of the decision to deny or condition the permit with the approved comprehensive plan;

(2) The extent to which the community meets or plans to meet the ten percent (10%) standard for existing low and moderate income housing units;

(3) The consideration of the health and safety of existing residents;

(4) The consideration of environmental protection; and

(5) The extent to which the community applies local zoning ordinances and special exception procedures evenly on subsidized and unsubsidized housing applications alike."

### Whether the Act Applies to Subdivisions of Land

■■■ The first issue raised by Coventry is whether the act in effect at the time Coventry passed upon Omni's proposal encompassed residential subdivision applications or whether it was limited to proposals for development of multifamily housing.[6] Originally enacted in 1991, the act clearly contemplated expedited review and approval of multifamily rental units. This conclusion is supported by the provisions of the act that establish the minimum standard for low and moderate income dwelling units based, in part, upon the number of low and moderate rental units existing in a given community, and the act's emphasis on rehabilitation of existing structures.[7] As the SHAB decision noted, the act and SHAB's own regulations were "drafted in such a way as to apply most clearly to multi-family housing, [however,] nothing in the statute or regulations prevents a developer from proposing a residential subdivision as affordable housing." We agree with this finding but recognize, as did the Legislature by its recent amendment to the act, see note 6, *ante*, the difficulties encountered by a zoning board in passing upon a single application for a special exception to construct a major subdivision.[8] Signifi-

---

bridge improvement. This issue was never resolved.

6. Section 45–53–4 recently was amended by P.L. 2002, ch. 416, § 1 to specifically address subdivision proposals and limit zoning board review to "hearings on applications under the zoning ordinance * * *." The amendment further provides that the chair of the state housing appeals board shall, "by regulation, provide for review by *planning boards* in cases of applications involving land development projects or subdivisions." *Id.* (Emphasis added.) Accordingly, the zoning board is now required to pass upon issues relating to that community's zoning ordinance and subdivision plans will be reviewed by the planning

board in accordance with regulations promulgated by SHAB.

7. Section 45–53–3(2)(i) sets the minimum standard for low and moderate income housing as follows: "(A) in the case of an urban city or town which has at least 5,000 occupied rental units and the units, as reported in the latest decennial census of the city or town, comprise twenty-five percent (25%) or more of the housing units, is in excess of fifteen percent (15%) of the total occupied rental units; or (B) in the case of all other cities or towns, is in excess of ten percent (10%) of the housing units reported in the census."

8. At the SHAB hearing, the record discloses that the members were in a quandary about

cantly, in G.L. 1956 chapter 23 of title 45 entitled "Subdivision of Land," the Legislature addressed the need for careful and uniform review of subdivision proposals and declared that "[t]he responsibilities of the local governments in regulating land development and subdivision have changed, increased in complexity, and expanded to include additional areas of concern[.]" Section 45–23–29(b)(3). Further, "[n]ot all instances of land development or subdivision are sufficiently reviewed prior to recording or construction, resulting in unwarranted environmental impacts, financial impacts on private individuals and communities, and inappropriate design[.]" Section 45–23–29(b)(5). Accordingly, in light of these findings, the General Assembly declared, *inter alia*, its intention to unify all local procedures for review and approval of subdivision applications, including a standard procedure for integrating the approvals of state regulatory agencies. The Legislature further required that "*all* proposed land developments and subdivisions [shall be] reviewed by local officials, following a standard process, prior to recording in local land evidence records." Section 45–23–29(c)(5). (Emphasis added.) These statutory requirements for *all* major land development or subdivision applications provide for one or more pre-application meetings in order for "the applicant to meet with appropriate officials, boards and/or commissions, planning staff, and, where appropriate, state agencies, for advice as to the required steps in the approvals process * * *." Section 45–23–35(a). Plan-

ning review of a major subdivision, such as the plan currently before this Court, "consists of three stages of review, master plan, preliminary plan and final plan * * *. Also required is a public informational meeting and a public meeting." Section 45–23–39(b). Chief among these uniform statutory requirements is the signature and recording of the final plat that constitutes acceptance by the municipality of any street or other public improvement. Clearly, the usual course of subdivision review by a planning board spans several months or years to complete and includes numerous amendments to the plan. None of this occurred in this case. Coventry, however, soldiered on, in good faith, and, after several hearings, the zoning board issued an approval in accordance with the town's zoning and subdivision regulations.

Although we are satisfied that the act in effect at the time of Omni's application did not exclude subdivision plans for low and moderate housing, we recognize the difficulty encountered by members of a zoning board who are unfamiliar with subdivision regulations and requirements, yet cognizant that a significant amount of the land in a subdivision eventually will be deeded to the municipality to hold in perpetuity, and that its citizens will reside in this development for many years. In recognition that a subdivision development requires further municipal involvement after final approval, SHAB requested, and the parties apparently agreed, to develop a protocol for resolving issues that may arise during the construction process.[9] In con-

---

the effect of any modifications by the Department of Environmental Management; whether Omni could turn to the town's planning board for modifications or whether the zoning board properly retained jurisdiction over this project. Questions also were raised about the final recording of the plat and how that would be accomplished. Omni suggested

that once the SHAB decision became final, the zoning board no longer would be involved in the process; SHAB suggested that the parties attempt to agree upon a protocol to resolve future problems.

9. SHAB also retained jurisdiction over this matter apparently to resolve, according to Omni, any construction-related disputes con-

clusion, although we are mindful of the myriad of problems that expedited review of major subdivision projects can present, we are not persuaded that this type of development was excluded by the act in effect at the time of these hearings.

### The SHAB Decision

In its decision approving the application, Coventry made fifty-six findings of fact and acknowledged that the town did not meet the statutory minimum for low and moderate income housing. Coventry found that Omni failed to submit all necessary forms and documentation to permit Coventry to consider and decide the issues ordinarily determined by other boards and commissions. The decision also found that the town's subdivision regulations require non-mountable concrete or granite vertical faced curbing because these materials provide "a measure of safety to both the pedestrians and motoring public, and facilitates public services such as the plowing of snow." It further found that the asphalt berm proposed by Omni easily can be mounted by a motor vehicle and is less safe and less durable than vertical face curbing.

With respect to the development's ingress and egress, Coventry found that a single-lane bridge that originally was designed to serve one or two homes and was intended by Omni to serve the development, was inadequate and did not satisfy the subdivision requirement for two access roads into the subdivision. Coventry rejected Omni's assertion that a homeowners association composed of the residents of the development could or should maintain the bridge and found that the subdivision regulations requiring secondary access

were designed for public safety. The zoning board also expressed its "grave concerns over public safety in the construction and design of the infrastructure of this subdivision in that a final plan and detailed engineering drawings have not been submitted by the applicant as required by [the town's subdivision regulations] and R.I.G.L. § 45–23–1 *et seq.* * * *." Further, Coventry found that the public roads, drainage facilities, and infrastructure eventually will be conveyed to the town and that the town has an interest in both satisfactory and safe construction.

Notwithstanding these concerns, Coventry issued an approval with certain modifications. Specifically, although it granted relief from several subdivision regulations, it declined to relieve Omni of the requirement of Article XIII, § B5 for secondary access, and required that Omni widen the existing bridge to a paved width of thirty feet with two travel lanes to "serve as a full roadway access in and to the subdivision." With respect to the density requirement for a residential cluster development, Omni was required to reconfigure the lot lines to remove land unsuitable for development from the minimum 15,000 square feet required for each lot by Article III, § C2 and Article IV, § A of the subdivision regulations. Further, Coventry declined to relieve Omni of fair share development fees for the market-rate homes. Finally, Coventry also found that no final plan illustrating all public improvements or lot lines was submitted and that continuing jurisdiction over the subdivision was necessary to insure the public safety of the residents of the community, including the residents of the subdivision.[10]

cerning this project. Coventry has not challenged this aspect of the decision.

**10.** Following SHAB's decision and apparently in accordance with SHAB's direction to the

parties to attempt to agree upon a protocol for monitoring the project through the various development stages, Omni returned to SHAB for additional relief from the cash bond requirement for infrastructure construc-

In its decision, SHAB addressed each issue raised by Omni and reversed the zoning board's decision. With respect to vertical face curbs as required by the town's subdivision regulations, SHAB found that:

"1. Vertical face curbs are not necessary for the health and safety of the occupants of the proposed housing or of the residents of the [t]own; are not necessary for the protection of the environment; are not consistent with local needs; and the cost creates an unnecessary restriction on affordability."

The board declared that the "required use of vertical face curbing reveals the issue to be one of planning preference rather than a health and safety issue" and in light of the need for affordable housing, "is not consistent with local needs." In reaching this decision, we are satisfied that SHAB overlooked Coventry's findings that the regulation requiring vertical face curbing was designed to protect the health and safety of the residents of the project and the community. Further, SHAB failed to point to any evidence in the record that supported its conclusion that this regulation is "a planning preference." Moreover, although SHAB declared the cost of vertical curbing was "an unnecessary restriction on affordability," and not consistent with local needs, it failed to undertake any analysis or point to any evidence that supports these conclusions. Finally, SHAB failed to find that this requirement renders the project infeasible as that term is defined in the act. A finding that a condition or requirement creates "an unnecessary restriction on affordability" is not the appropriate standard of review and is an insufficient reason to vacate or modify a zoning decision. Rather, the appropriate

inquiry is whether this condition, alone or in combination with others, made it impossible for Omni to proceed with the proposed development without incurring financial loss. We are satisfied that SHAB erred in reaching this decision without making this specific finding and a remand for further findings of fact is necessary.

The SHAB decision also relieved Omni from complying with the minimum lot size requirements for a residential cluster development:

"The reconfiguring of the lot lines is not necessary for the health and safety of the occupants of the proposed housing or of the residents of the [t]own; is not necessary for the protection of the environment; is not consistent with local needs; and that the cost creates an unnecessary restriction on affordability."

The SHAB decision does not take into account Article IV, § A of the town's subdivision regulations that provides for residential cluster developments in limited situations that specifically are intended to preserve open space. A residential cluster development is permissible only if "[t]he overall residential density on the parcel shall not exceed that permitted in the zoning district * * *." *Id.* Significantly, Coventry, in its decision, found that no final plan depicting public improvements or lot lines had been submitted and that Omni apparently intended to include land deemed unsuitable for development as part of the individual house lots to attain the minimum lot size of 15,000 square feet. The town argued to SHAB that Omni proposed one lot with a cemetery as its yard and another lot with 10,000 square feet of wetland as part of the 15,000 square foot minimum. Coventry insisted that children

tion. We note that this issue was not raised before Coventry nor was it part of Omni's appeal; however, because SHAB denied the requested relief we need not address the question of SHAB's continuing jurisdiction.

from low and moderate income families should not have to play in a cemetery or a wetland any more than children from other families. Coventry simply directed that Omni comply with the lot size regulation for a residential cluster development, which requires that land unsuitable for development be deducted from the total amount of available land before a density calculation is made. According to Coventry, land deemed unsuitable for development should not become part of the yards in this development.[11] We conclude that SHAB failed to address the subdivision regulations for residential cluster developments and overlooked the fact that a residential cluster subdivision is designed to preserve open space by permitting construction on smaller lots in exchange for larger amounts of open space.[12] The decision also overlooked the regulation that provides that a residential cluster subdivision is not allowable as of right but only after a showing that "such a development would be a better use of the land than a conventional subdivision and is in the best interests of the residents of Coventry." Accordingly, we vacate that portion of the SHAB decision and remand this issue to SHAB for further findings consistent with this opinion.

 The SHAB decision also relieved Omni of providing a secondary access into the development by widening an existing bridge to a full roadway width.

The evidence disclosed that Omni intended that the residents of the subdivision use this bridge, but that it remain twelve feet wide. Coventry argued that its snow plows are eleven feet wide, making it virtually impossible to plow this bridge during a snowstorm. Omni suggested that a homeowners association be responsible for the bridge or that Coventry purchase a smaller snow plow. Coventry argued against imposing this responsibility on a homeowners association. This issue was not resolved. Further, a factual dispute arose about the actual cost of this improvement. Omni maintained that the cost was $100,000 and Coventry produced evidence targeting the cost at $50,000. This dispute was not resolved. In its decision, SHAB declared that a secondary access road was "not necessary for the health and safety of the occupants of the proposed housing or of the residents of the [t]own," but failed to set forth its reasoning for this finding or the evidence upon which it relied. Further, SHAB declared that this improvement was not necessary for the protection of the environment and was not consistent with local needs. Similar to its finding about the vertical face curbing, SHAB concluded that this requirement was a "planning preference" and noted that although two access streets are desirable for snow removal and garbage pickup, this "planning preference must yield to the greater need

---

11. Article III, § B of the subdivision regulations defines land unsuitable for development as wetlands, land located in a flood zone, streets and sidewalks, public and private easements, land containing steep slopes and cemeteries. According to plaintiff, Omni's plan included each category except a flood zone.

12. Article IV, § A(1) of the town's subdivision regulations provides in pertinent part:
 "Residential Cluster Developments are intended to promote the health, safety and welfare of the residents of Coventry by en-

couraging harmonious, efficient and convenient living environments and communities; increasing housing opportunities by increasing variety in residential housing types, density and design; facilitating the economical and efficient provision of necessary community services, recreational facilities and open space; preserving features and sites that have natural, ecological, cultural, historical, agricultural, scenic, or other interest or value; and encouraging innovative residential design."

for affordable housing." However, the decision failed to address Coventry's conclusion that a second access into the development was intended for public safety and the town's "grave concerns over public safety in the construction and design of the infrastructure of this subdivision[.]" Finally, the decision also failed to address whether this requirement made the project infeasible. Again, SHAB found that the cost "creates an unnecessary restriction of affordability" an incorrect standard of review. The test is whether or not the requirement—alone or in combination with other conditions—makes the project infeasible, that is, impossible to complete without Omni incurring financial loss. Such a finding necessarily involves an examination of an accurate estimated cost of the improvement and whether any alternative measures, including redesign, are available that make construction possible. We note that Omni bears the burden of proof on this issue and must produce evidence demonstrating that this requirement makes the project infeasible.

The final issue addressed by SHAB was the imposition of development impact fees on the market-rate homes. Coventry has challenged the authority of SHAB to disturb its decision requiring fees for market-rate homes. Specifically, Coventry points to the Rhode Island Development Impact Fee Act, G.L. 1956 chapter 22.4 of title 45, as enacted by P.L.2000, ch. 508, § 1, the enabling legislation for the town's impact fee ordinance. The plaintiff maintains that an explosion of development in the town has placed an unreasonable burden on Coventry's ability to provide services to its residents. Omni argues, and we agree, that the imposition of these fees upon low and moderate income housing initiatives may have a deleterious effect on the development of affordable housing in the community. We

therefore are persuaded that SHAB may examine these fees in accordance with the act and determine whether the imposition of development impact fees makes the project infeasible.

The record reveals that members of SHAB were concerned that Omni enjoyed wide latitude in pricing these homes, from $160,000 to $190,000, and that Omni could realize a windfall if relieved from the requirement of impact fees. The actual price Omni intended to charge for each market-rate home was not established. However, it also was disclosed that Coventry's development impact fees were the highest in the state. Accordingly, SHAB vacated that portion of the decision and declared that the imposition of development impact fees on the market-rate homes makes construction of the project infeasible. Further, SHAB directed that any excess profit over that projected in the pro forma be forwarded to the town in lieu of impact fees, but restricted the use of this money to affordable housing initiatives. Although SHAB may relieve a developer of development impact fees as part of its statutory responsibilities, it may do so only upon a finding that the fees make the project infeasible. Accordingly, we remand this decision to SHAB for further fact-finding pertaining to this issue.

Finally, we note that in an effort to prevent a windfall to Omni by relieving it of development impact fees, SHAB directed that any excess profit Omni realized from this project be paid to the town, but that its use be restricted to spending to rehabilitate affordable housing in accordance with the Community Development Block Grant rules and regulations. We are of the opinion that SHAB's authority is limited by the act and does not extend beyond the authority to affirm, vacate, or modify a decision issued by a zoning board in accordance with the act.

Although SHAB may direct payments in lieu of impact fees, it has no authority to control the manner in which a municipality spends its revenue. Accordingly, we vacate that portion of the decision.

### Conclusion

In conclusion, for the reasons set forth herein, the plaintiff's appeal is sustained in part and denied in part. We vacate the decision of the State Housing Appeals Board and remand this case to that board for further proceedings in accordance with this opinion and with the following specific directions:

1. With respect to vertical face curbs, SHAB must make appropriate findings on whether imposing this condition alone or in combination with other requirements makes the project impossible without incurring financial loss.

2. With respect to minimum lot size requirements for a residential cluster development, SHAB must take into account the town's subdivision regulations providing for residential cluster development intended to preserve open space and make findings on whether adherence to the minimum lot size regulations for a residential cluster development, which require that land unsuitable for development be excluded from density calculations, renders the project infeasible, and state why these regulations are not consistent with local needs.

3. With respect to the secondary access into the development, SHAB must resolve issues of bridge width, public safety, and responsibility for maintenance, including snowplowing, and make specific findings on whether requiring this second access into the development, alone or in combi-

nation with other requirements, made the project impossible to complete without financial loss.

4. With respect to the impact fees, SHAB must make findings on whether the project would be made infeasible without relief from the fees.

Justice LEDERBERG participated in all proceedings but deceased prior to the filing of this opinion.