HOUSING OPPORTUNITIES
CORPORATION et al.

v.

The ZONING BOARD OF REVIEW
OF the TOWN OF JOHNSTON
et al.

No. 2004–75–Appeal.

Supreme Court of Rhode Island.

Jan. 11, 2006.

David V. Igliozzi, Cranston, for Plaintiffs.

David L. Krech, for Defendants.

Present: WILLIAMS, C.J.,
GOLDBERG, FLAHERTY, SUTTELL,
and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The plaintiffs, Housing Opportunities Corporation (HOC) and LaCasa Development Corporation (LaCasa),[1] appeal from a decision of the State Housing Appeals Board (SHAB)[2] which affirmed the Town of Johnston Zoning Board of Review's denial of an application for a comprehensive permit for low and moderate income housing.

### Facts and Procedural History

On May 27, 2003, HOC filed an application with the zoning board to obtain a comprehensive permit for the development of low and moderate income housing.[3] HOC proposed to construct a 44,265 square foot building, which would stand three stories, or forty-one feet in height, and consist of forty-nine one-bedroom units for low and moderate income persons age sixty-two or older, and one two-bedroom unit for an on-site manager. The

site in controversy is approximately 3.7 acres in area, located at 369 Greenville Avenue in Johnston, and designated as assessor's plat no. 48–1, lot nos. 90 and 94. At the time HOC submitted its application, a portion of the property was zoned R–20 and the remainder was zoned R–40.[4] In its application to the zoning board for a comprehensive permit, HOC requested relief from a variety of land use regulations imposed upon the property. For example, the applicant requested variances to: (1) permit multifamily development in an area zoned for medium to low density residential; (2) construct 13.4 dwelling units per acre compared with the maximum ten dwelling units per acre allowed for multifamily developments; (3) build fifty single-bedroom units within a single structure, as opposed to the twelve-unit maximum as permitted by ordinance; (4) obtain relief from the maximum height allowance by six feet; (5) garner approval to provide only eighty-two parking spaces, instead of the required two spaces per dwelling unit; (7) build the proposed multifamily development within thirty-seven feet of an existing single family residence on the site,[5] even

1. Housing Opportunities Corporation is a nonprofit Rhode Island corporation, which formed LaCasa Development Corporation, also a nonprofit corporation. We will refer to HOC and LaCasa collectively as "HOC."

2. The State Housing Appeals Board was created by the General Assembly to review the decisions of local zoning boards with regard to applications filed under the Low and Moderate Income Housing Act. See G.L.1956 §§ 45–53–5, 45–53–7.

3. The application was filed pursuant to § 45–53–4(a), which provides that "[a]ny applicant proposing to build low or moderate income housing may submit to the local review board a single application for a comprehensive permit to build that housing in lieu of separate applications to the applicable local boards."

4. The Town of Johnston Zoning Ordinance defines an R–20 district as one that is "composed of certain quiet medium—low density residential areas of the Town plus certain open areas where similar residential development appears likely to occur." The zoning ordinance defines its R–40 district as one that "covers a large portion of the Town into which urban-type development should logically expand as the need arises. This district is characterized as a commingling of open land interspersed with residential uses." The zoning ordinance requires a minimum lot size of 40,000 square feet to construct a single family dwelling in an R–40 zone and 20,000 square feet to build a single family dwelling in an R–20 zone.

5. The record reveals that there is a single family dwelling located on lot 90.

though the relevant ordinance specified that no structure be placed any closer to another structure than a distance twice the height of the taller structure, which in this case would be eighty-two feet.[6]

The zoning board conducted hearings on the application on June 26, 2003 and July 8, 2003. The planning board also held a hearing on July 1, 2003, after which it expressed its concerns and reservations about the application in a letter to the zoning board.[7] At the conclusion of its second hearing on July 8, 2003, the zoning board voted unanimously to deny the application. It issued a written decision on July 24, 2003, which specified the grounds upon which the zoning board based its denial of a comprehensive permit. The zoning board rejected the application because (1) the proposal was inconsistent with local needs as a result of a failure to meet or adequately address the density requirements of the particular zoning districts; (2) the proposal did not comply with the town's Comprehensive Plan with regard to the density, building height, and physical characteristics of the site; (3) the proposal failed to address the health and safety concerns of current residents, in that no provision for the sufficiency and flow of sewers had been submitted, no provision for flow rate of the sewers was made, and no adequate provision for water runoff was presented; (4) the applicant did not consider the recommendations of the planning board so that the project might

be more suited to the needs of the town and its residents; and (5) the applicant failed to resolve wetlands and water runoff issues that might adversely affect the health and safety of the surrounding residents.

On July 15, 2003, HOC timely appealed to SHAB,[8] in accordance with G.L.1956 § 45-53-5. In its appeal, HOC argued that the evidence did not support the zoning board's decision. Specifically, it claimed that there was no competent testimony to support the following findings: that the proposal was inconsistent with local needs, that the proposal did not conform with the Comprehensive Plan, that the community had plans to meet the standard of 10 percent assisted units, or that the concerns for the environment and the health and safety of current residents were not adequately addressed in HOC's proposal.

After conducting two hearings on the appeal, SHAB determined that further review was required and the board voted unanimously that the parties submit supplemental testimony[9] regarding four issues: (1) whether the scale and scope of the project was consistent with the general characteristics of the surrounding area; (2) Johnston's efforts to meet affordable housing needs and whether it had prevented any affordable housing from being built; (3) whether the Town of Johnston had applied its development regulations equally to affordable housing proposals and oth-

---

6. We note that HOC requested additional zoning code variances and exceptions to applicable subdivision regulations.

7. In its written decision, SHAB observed that there was a procedural error because the planning board did not make a preliminary review before the zoning board's initial hearing on June 26, 2003. SHAB found, however, that the planning board made its recommendations before the zoning board's final hearings and HOC had not demonstrated that this

procedural nonconformance had any prejudicial or material impact on the processing of their application.

8. It appears from the record that HOC appealed the zoning board's denial before the zoning board issued its written decision.

9. We note that the supplemental submissions actually were unsworn written responses to questions posed by SHAB.

er proposals; and (4) whether there were other sites in Johnston that could accommodate affordable housing. After SHAB reviewed the supplemental written submissions it had requested and after the parties presented oral arguments, SHAB deliberated and then denied HOC's appeal on January 27, 2004.[10]

As a result of its deliberations, SHAB made several findings of fact. First, it determined by an eight-to-zero [11] vote that the Town of Johnston had neither met, nor presented a plan to meet, the 10 percent standard for low and moderate income units or the 15 percent standard for occupied rental units as provided in § 45–53–3(2)(i)(A).[12] Second, SHAB found by an eight-to-zero vote that the zoning board acted consistently with the town's Comprehensive Plan when it denied the application. Third, SHAB evaluated the record with respect to issues affecting the health and safety of existing residents. It expressed concern with the burden of proof placed on HOC in the proceedings before the zoning board and noted that a local zoning board should not require an applicant for a comprehensive permit to present evidence of regulatory approvals as

part of its initial review of an application. SHAB then voted to determine whether the zoning board acted in conformity with the evidence and whether it properly found that HOC failed to sufficiently address issues of health and safety of existing residents. However, this vote was evenly divided and the motion did not pass. To resolve this dilemma, a subsequent motion was made to determine that, notwithstanding the zoning board's improper findings and conclusions about sewer and runoff issues,[13] there was sufficient record evidence relating to density and planning concerns to uphold the zoning board's decision to deny the application based on health and safety concerns.[14] This dispositive motion passed by a vote of a six-to-two, and thus the zoning board's decision to deny HOC's application for a comprehensive permit was upheld. On appeal to this Court, HOC argues that SHAB erred when it found that the zoning board's denial of HOC's application for a comprehensive permit was consistent with the Town of Johnston's Comprehensive Plan. HOC also contends that SHAB's decision to uphold the zoning board's ruling was clearly erroneous in view of the evidence.

10. SHAB issued a written decision on March 2, 2004.

11. It appears from the record that eight of SHAB's nine members participated in the appeal.

12. The Low and Moderate Income Housing Act prescribes affordable housing goals of cities and towns in this state. *See* §§ 45–53–1, 45–53–3(2)(i) and (ii).

13. During the proceedings, a SHAB board member expressed concern that the zoning board had "exceeded its authority with regard to the health and safety issues, specifically, the water runoff and sewer capacity issues in that it acted against the record or imposed unreasonable requirements." Moreover, in its written decision, SHAB stated that "the town prematurely imposed certain requirements on [HOC] regarding regulatory approv-

als for the project." Therefore, in reviewing this appeal, we do not rely on or consider the zoning board's findings that (1) the proposal failed to address the health and safety concerns of the current residents in that no provision for the sufficiency and flow of sewers was submitted, no provisions for flow rate of the sewers were made, and that no adequate provision for water runoff was presented, and (2) that the applicant failed to resolve wetlands issues and issues of water runoff that might adversely affect the health and safety of the surrounding residents.

14. SHAB found that "the proposed development, on the whole, is incompatible with the surrounding neighborhood adjacent to the Site and raises legitimate health and safety concerns to the existing neighborhood."

## Standard of Review

■ This Court will reverse a SHAB decision if it "violates constitutional or statutory provisions, was made in excess of statutory authority or upon error of law, or was otherwise clearly erroneous in view of the evidence or was otherwise arbitrary or capricious." *Coventry Zoning Board of Review v. Omni Development Corp.*, 814 A.2d 889, 898 (R.I.2003).

## I

## Comprehensive Plan

■ HOC argues that SHAB erred when it determined that the zoning board's denial was consistent with Johnston's Comprehensive Plan. When an application for a comprehensive permit filed under the Low and Moderate Income Housing Act is denied, or granted with conditions that make it infeasible,[15] the applicant has the right to appeal to SHAB. Section 45–53–5. On appeal, it is SHAB's duty to determine whether the local zoning board's decision was "reasonable and consistent with local needs." Section 45–53–6(b)(i). The act defines "consistent with local needs" as:

"[R]easonable in view of the state need for low and moderate income housing, considered with the number of low income persons in the city or town affected and the need to protect the health and safety of the occupants of the proposed housing or of the residen[ts] of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces, and if the local zoning or land use ordinances, requirements, and regulations are applied as equally as possible to both subsidized and unsubsidized housing." Section 45–53–3(2).

The statute also enumerates several standards SHAB should consider when it reviews a local zoning board's decision to grant or deny a comprehensive permit:

"(1) The consistency of the decision to deny or condition the permit with the approved affordable housing plan[16] and/or approved comprehensive plan;[17]

"(2) the extent to which the community meets or plans to meet housing needs, as defined in an affordable housing plan, including, but not limited to, the ten percent (10%) goal for existing low and

---

**15.** Section 45–53–3(3) defines "infeasible" as "any condition brought about by any single factor or combination of factors, as a result of limitations imposed on the development by conditions attached to the approval of the comprehensive permit, to the extent that it makes it impossible for a public agency, nonprofit organization, or limited equity housing cooperative to proceed in building or operating low or moderate income housing without financial loss, within the limitations set by the subsidizing agency of government, on the size or character of the development, on the amount or nature of the subsidy, or on the tenants, rentals, and income permissible, and without substantially changing the rent levels and unit sizes proposed by the public agency, nonprofit organization, or limited equity housing cooperative."

**16.** An affordable housing plan is "a component of a housing element, [designed] * * * to meet housing needs in a city or town." Section 45–53–3(6). The General Assembly did not introduce the concept of an "affordable housing plan" into § 45–53–6 until 2004. Therefore, neither the zoning board, which conducted its proceedings in 2003, nor SHAB, which began its hearings in 2003, inquired into whether Johnston had an approved affordable housing plan.

**17.** HOC argues on appeal, that the Town of Johnston has not had its Comprehensive Plan approved by the director of administration for the state of Rhode Island as required by G.L. 1956 § 45–22.2–9.

moderate income housing units as a proportion of year-round housing;

"(3) the consideration of the health and safety of existing residents;

"(4) the consideration of environmental protection; and

"(5) the extent to which the community applies local zoning ordinances and review procedure evenly on subsidized and unsubsidized housing applications alike." Section 45–53–6(c).

In a case of first impression, this Court interpreted SHAB's role under the Low and Moderate Income Housing Act and declared that SHAB's first step in determining whether a decision is consistent with local needs is to examine the zoning and land use regulations upon which the zoning board rested its decision and compare those to the community's comprehensive plan. *Omni Development Corp.*, 814 A.2d at 900.

HOC argues that SHAB erred when it found that the zoning board's decision was consistent with Johnston's Comprehensive Plan. To support this argument, HOC refers to Daniel Varin's [18] report, in which he explained that Johnston's Comprehensive Plan "includes many provisions that support approval of a comprehensive permit for housing that is affordable to older persons." According to the report, one of the goals of the land use element of the town's Comprehensive Plan is "to provide balance in zoning districts and land use regulation,

to insure variety in resulting land uses and densities." Varin opined that, in accordance with the Comprehensive Plan, a moderately sized multifamily structure would provide diversity of housing types in an otherwise largely single family neighborhood. Moreover, Varin's report explained that the stated goals of the Comprehensive Plan's housing element are to provide safe, sanitary, and affordable housing to residents of all income levels, to increase the number of state and federally subsidized housing units, to actively seek federal and state loan and grant funds for construction and support of affordable housing, and to revise the zoning map to provide for denser housing in areas of good highway access, as well as in the areas that already are urbanized. Varin concluded that HOC's proposal responds to these goals and provides "the type and cost of housing sought in the kind of location that the Plan recommends for this purpose."

In contrast, Edward Pimentel's report and testimony before the zoning board highlighted the inconsistencies between HOC's application and Johnston's Comprehensive Plan.[19] According to Pimentel's report, the town's Future Land Use Map [20] designated the area in controversy as "No Change." This language, Pimentel said, suggests that the town intended for the area in question to be "maintained in a low to moderately-low residential density."[21]

---

**18.** Daniel Varin is a planning consultant who testified before the zoning board and also prepared an evaluation, which was presented to the zoning board, in support of HOC's application for a comprehensive permit.

**19.** Edward Pimentel is a certified planner who was retained by abutting neighbors to testify as an expert witness before the zoning board. He was also retained by the zoning board, during HOC's appeal before SHAB, to respond to SHAB's request for further testimony on four issues.

**20.** It appears from Pimentel's report that the Future Land Use Map is a component of the land use element.

**21.** In response, HOC argued that although the Future Land Use Map designates the eastern part of Johnston, where the property in question is located, as "no change," the text of the land use element of the Comprehensive Plan identifies certain urbanized areas in the eastern part of Johnston as appropriate for higher density residential development.

Accordingly, Pimentel concluded that HOC's proposal to build fifty units on the property is "a far cry" from the maximum four to eight dwelling units that could be built there under the existing zoning designation.

The record reveals that before making the decision in this case, SHAB board members discussed Johnston's Comprehensive Plan in terms of its relationship with existing land use designations, as well as its goal of creating more affordable housing. SHAB found particularly troubling the substantial disparities in height and density between the proposed three-story building and the residential properties adjoining the site.[22] In fact, SHAB found the proposed development to be "incompatible" with the surrounding neighborhood. Accordingly, all eight members of the board, who were present, agreed that the zoning board's denial of HOC's application was consistent with the town's Comprehensive Plan.

We have reviewed the record thoroughly, and in our opinion, SHAB's decision was based on substantial evidence that the size, density, and intensity of use proposed in the application was not consistent with the Comprehensive Plan as it relates to this particular parcel of land, even though the development would further the town's goal of providing more low and moderate income housing. SHAB's decision did not violate constitutional or statutory provisions, was not made in excess of statutory authority or upon error of law, was not clearly erroneous in view of the evidence, or otherwise arbitrary or capricious. Therefore, we hold that SHAB did not err when it found that the zoning board's decision was consistent with the Town of Johnston's Comprehensive Plan.

## II

### The Evidence

HOC also argues that SHAB's decision to uphold the zoning board's denial clearly was erroneous in view of the evidence. HOC contends that SHAB based its decision solely on the fact that the project would be located next to a residential neighborhood, which is zoned for single family development. But, HOC claims, the Low and Moderate Income Housing Act does not permit the denial of an application for a comprehensive permit based on existing zoning alone. Our decision in *Omni* lends some support to this argument. There, we said that "[i]n cities and towns that fall short of the statutory quota for low and moderate income housing units, land use ordinances and requirements are not conclusively deemed consistent with local needs." *Omni Development Corp.*, 814 A.2d at 899. However, it is our opinion that the Low and Moderate Income Housing Act permits SHAB to affirm a zoning board's denial of a comprehensive permit based on the project's potentially deleterious effects on the character of the surrounding area, if that impact is considered in light of the entire statutory definition of "consistent with local needs" as well as the standards delineated in § 45–53–6(c). To support this proposition, we refer to the statutory definition of "consistent with local needs," which provides that the need "to promote better site and building design in relation to the surroundings," § 45–53–3(2), is a legitimate factor for SHAB to consider when it reviews the decision of a local zoning board to deny, or approve with conditions, an application for a comprehensive permit.

---

**22.** It is noteworthy that SHAB also found Johnston's history of hostility towards affordable housing to be troubling.

Here, the record is replete with evidence that HOC's proposal would not fit harmoniously within the surrounding neighborhood. In its correspondence to the zoning board, the planning board expressed the following concerns about HOC's application:

"The Planning Board is very concerned about the 'character of the neighborhood' with respect to the introduction of such a large scale structure (3-story height, 5,001 sq. ft. building footprint) into the existing predominantly 1-story home neighborhood. The area is. primarily comprised of single family residential homes which could be dwarfed by this very large structure. This issue relates more to the need to preserve neighborhood character with the introduction of properly and similarly designed buildings and developments."

The planning board pointed out that the topography of the site is such that the land slopes down toward the properties on Spring Hill Drive. Because the proposed building would be situated near the top of the hill, it would appear much taller than forty-one feet and have the effect of "dwarf[ing]" the neighboring one-story homes. The planning board also was concerned about the location and size of the parking area, which would be in the front yard, set back ten feet from the street, even though the zoning ordinance prohibits parking within the required minimum front yard, which in this project would extend fifty feet from the boundary line. The planning board suggested that HOC consider a campus-style setting, which would eliminate a large area of pavement and asphalt next to Greenville Avenue, allow for the design of smaller parking areas adjacent to smaller structures, and

incorporate landscaping and other comfort features.

David Isherwood, a certified real estate appraiser, prepared a report in response to SHAB's inquiry into the compatibility of the project with the surrounding area. Isherwood's report said that the neighborhood proximate to the site is composed predominantly of suburban residential homes, 87 percent of which are single-story dwellings, with a typical living area of 1,446 square feet. The neighborhood has a density of 3.85 units per acre and the average building encompasses 14 percent of the total land area. In contrast, the building HOC proposes to construct is nearly thirty-one times larger than the average single family home in the area, would have a density that is over 327 percent greater than is the norm in the neighborhood, and encompass 34 percent of the total land area. As a result, Isherwood concluded that the proposed development would be detrimental to the character and the balance of the area.

Similarly, SHAB placed particular emphasis on the substantial disparities in height and density between the proposed three-story building and the residential properties adjoining the site. SHAB expressed its concern that the proposed structure would exceed the zoning code's maximum height allowance and "scale substantially above the closely bordering residences." The record reveals that the proposed density for the project is approximately thirteen units per acre, which would constitute an increase in density of more than 650 percent in relation to the existing zoning in the area.[23] It seems to us that concerns about the proximity of the building, mammoth in size in comparison to the surrounding homes, are well placed.

23. Edward Pimentel produced these statistics in his report, which also stated that "such a

bonus [in density] has not been heard of or approved to date."

We are of the opinion that the record supports SHAB's decision to affirm the zoning board's determination to deny the application. SHAB's obligation, in reviewing the zoning board's decision, was to determine whether that decision was consistent with local needs. With respect to a community, such as Johnston, which has not achieved the statutory goal of 10 percent low and moderate income housing, § 45–53–3(2) defines "consistent with local needs" as "reasonable in view of the state need for low and moderate income housing" as well as "the need to protect the health and safety of * * * the residen[ts] of the city or town [and] promote better site and building design in relation to the surroundings * * *." We are convinced that there is ample evidence in the record that the proposed development of this large structure, which would require a multitude of variances from local zoning ordinances and subdivision regulations, would differ substantially from and dominate the surrounding neighborhood in terms of density, intensity of use, and overall size.[24] Therefore, it is our opinion that the evidence is sufficient to support SHAB's determination that the zoning board's decision to deny HOC's application for a comprehensive permit was consistent with local needs.

## Conclusion

For the reasons set forth herein, we affirm the judgment of SHAB, to which we return the papers in this case.

---

**24.** We note with great emphasis that SHAB's written decision, as well as transcripts from its proceedings, reveal that SHAB weighed this evidence in light of other considerations set forth in §§ 45–53–3(2) and 45–53–6(c), such as the state's need for low and moderate income housing, the number of low income residents in the town, and the extent to which the community meets or plans to meet housing needs.