**EAST BAY COMMUNITY
DEVELOPMENT
CORPORATION**

v.

**The ZONING BOARD OF REVIEW
OF the TOWN OF
BARRINGTON.**

No. 2004–330–Appeal.

Supreme Court of Rhode Island.

June 30, 2006.

Anthony DeSisto, Providence, for Plaintiff.

Dennis T. Grieco, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The Town of Barrington (town) appeals from a decision of the State Housing Appeals Board (SHAB) that would allow for the construction of a fifty-unit low or moderate income housing development. Reversing a decision of the Zoning Board of Review of the Town of Barrington (zoning board), SHAB declared the project to be consistent with local needs under the provisions of the Low and Moderate Income Housing Act (act), G.L. 1956 chapter 53 of title 45. We affirm the decision of SHAB

and direct the zoning board to issue all necessary permits and approvals, subject, however, to the zoning board's authority to impose such conditions and requirements as are consistent with the act, the decision of SHAB, and this opinion.

## I

### Facts and Procedural History

On August 27, 2003, East Bay Community Development Corporation (East Bay), a private nonprofit organization formed in 1989, applied for a comprehensive permit (permit) to develop low or moderate income housing in the town. East Bay's comprehensive permit application (application) sought to develop 8.64 acres of land near the intersection of Washington Road and Bay Spring Avenue, Assessor's plat No. 2, lot Nos. 106, 110, and 147 (site). The proposed name for the development was "Sweetbriar." The application called for the renovation of an existing single-family home and the construction of twenty-three duplexes that would create forty-seven rental units available for households earning at or below 60 percent of the area's median income. Additionally, the application proposed the construction of three single-family homes, one of which would be available for sale to a household earning at or below 80 percent of the median income, with the remaining two available for sale to households earning at or below 120 percent of the median income. In total, Sweetbriar would provide the town with fifty housing units, the great percentage of which would be designated as "low or moderate income housing" as defined by G.L.1956 § 45–53–3(5).

East Bay's application, filed with the zoning board pursuant to § 45–53–4, requested waivers from several provisions of the town's zoning ordinance (zoning regulations). Relevant to this appeal, East Bay sought a waiver from a use regulation, Barrington Zoning Ordinance, Art. IV, § 185–8 (June 22, 1994), prohibiting multi-family dwellings in zoning districts designated as "Business" districts. According to East Bay, such a waiver was crucial to the development of Sweetbriar because it would allow for the construction of the twenty-two duplexes proposed for lot No. 110. Lot No. 110 was located in a business district and comprised more than 90 percent of the entire project. Lot Nos. 106 and 147, however, were zoned for "Neighborhood Business" and, to the extent called for by the application, did not require a waiver for the construction of duplexes.[1] The remaining requests sought waivers from various municipal fees associated with the proposal and from requirements concerning dimensional area and lot coverage, off-street parking, sidewalks, and granite curbing.

The zoning board held numerous hearings between September 24, 2003, and April 1, 2004, to address East Bay's application for a permit. On May 19, 2004, the zoning board deliberated upon its findings of fact with input from the parties. On June 15, 2004, the zoning board unanimously adopted a written decision denying Easy Bay's application based on the zoning board's findings of fact. The findings relevant to this appeal provided as follows:

"1. Application does not conform to Comprehensive Plan for the Town of Barrington.

" * * *

---

1. The residential use regulation permits "[t]wo-family dwelling[s]" in districts zoned for "Neighborhood Business" only as "a special use * * * subject to action by the Zoning Board of Review." Barrington Zoning Ordinance, Art. IV, § 185–8 (June 22, 1994) (Zoning Use Table B).

"5. \* \* \* [A]pplication does not meet the Comprehensive Plan because the Plan calls for business or elderly housing use for the site.

"6. Safety was not adequately addressed as follows:

"● The Applicant's traffic study lacked credibility because it was performed in the summer on one day when traffic would normally be light. There was no school or regular commuter traffic, or church traffic. Furthermore, construction and road repaving were being done in the area as well as in the area of Middle Highway and Lincoln Avenue further reducing the traffic count. These roads are feeders to Washington Road.

"● Exhibit '18' was a prior traffic study done for another application on Bay Spring Avenue which contradicts the Applicant's study.

"● The plan as designed failed to meet certain fire code requirements for 17 units as to access as described in the Fire Chief's letter. The proposed road would be a race track shaped oval (Exhibit '43') which is not safe for a family residential neighborhood.

" \* \* \* \*

"9. Applicant failed to show project would meet local needs as follows:

"● Did not comply with Comprehensive Plan in that the Project was neither business nor elderly housing.

"● Negative impact on public safety to surrounding area because of traffic. Safety of Town residents because of fire safety.

"● Granite curbing would be needed for safety in snowplowing and proper street drainage. No curbing requires increased maintenance by the Town. It also demarks the road from the residential property lines.

"● The density of the proposed development is significantly greater than the surrounding neighborhood and there is not enough open space for the number of units being proposed. These circumstances would alter the character of the surrounding residential neighborhood, and as a result, the proposed development does not promote better site and building design in relation to the surrounding area.

" \* \* \* \*

"11. Even though the Project is too dense for this site, it would be suitable for affordable housing."

The decision concluded that, based on the testimony of witnesses, the production of exhibits, and the record as a whole, East Bay's application was "inconsistent with local needs" and "inconsistent with the state approved Comprehensive Community Plan." [2] Although the decision's conclusory language did not mention specifically the inadequacy with which East Bay's application addressed environmental, health, and safety concerns pertaining to current resi-

---

**2.** The language of the zoning board's decision mistakenly noted that East Bay Community Development Corporation's (East Bay) application was " 'inconsistent with local needs' pursuant to R.I. Gen. Laws § 45–53–3." However, the statutory authority upon which a zoning board may deny an application on the basis that the application is "inconsistent with local needs" is G.L.1956 § 45–53–4, *as defined by* § 45–53–3(2). Although the zoning board did not state the statutory authority for the conclusion that the application was "inconsistent with the state approved Comprehensive Community Plan," that authority existed in § 45–53–4, as well.

dents, that ground for denial appeared in the decision's findings of fact.[3]

On June 22, 2004, East Bay filed a timely appeal to SHAB pursuant to § 45–53–5. SHAB held a hearing to review the decision of the zoning board on October 12, 2004, at which time the parties were able to present arguments supporting or opposing the zoning board's decision. Although SHAB did not conduct an evidentiary hearing, the parties were permitted to supplement the record from the zoning board proceedings with relevant portions of the "BARRINGTON COMPREHENSIVE COMMUNITY PLAN" (town's plan) and applicable zoning regulations. Toward the close of the October 12, 2004 hearing, SHAB deliberated upon and unanimously adopted a series of findings, the thrust of which vacated the decision of the zoning board denying Easy Bay a permit. SHAB issued a written decision to that effect on November 8, 2004, setting forth its findings of fact:

> "The Town does not currently meet the ten percent affordable housing standard and does not have a plan to meet that standard.
>
> "The Zoning Board's decision was not consistent with local needs and did not weigh the state's need for low and moderate income housing against some of the other concerns that were raised in opposition to the proposal.
>
> "A comprehensive plan is a local zoning or land use ordinance, requirement, or regulation within the meaning of the [Low and Moderate Income Housing] Act.

> "This application is not inconsistent with the Comprehensive Plan of the Town of Barrington.
>
> "[East Bay] adequately addressed health and safety issues in its application and adequately considered environmental protection issues and requirements of the [Low and Moderate Income Housing] Act.
>
> "There is no competent evidence in the record to support the determination of the Zoning Board that the opinion advanced by the traffic expert was not credible and not supported by evidence of record.
>
> "As to fire safety, other proposals that were not affordable housing have been approved with conditions, and the typical time for decisions to be made regarding compliance with the fire code is when a building permit is requested and not the comprehensive permit stage of the proceeding."

Additionally, SHAB made findings specifically addressing each of the zoning board's findings of fact and provided the reasoning upon which SHAB based its findings and ultimate conclusion to "reverse[ ] the Zoning Board's decision and remand[ ] this matter to the Zoning Board for action consistent with this decision." SHAB noted that its reversal of the zoning board's decision, which consequently would result in East Bay's attainment of a permit to develop Sweetbriar, was "subject to [East Bay's] procurement of all necessary state and federal approvals."[4]

On November 1, 2004, the town council, by and through its solicitor, and the zoning board prematurely filed a notice of appeal

---

**3.** Section 45–53–4 provides an additional ground for a zoning board's denial of an applicant's permit "if concerns for the environment and the health and safety of current residents have not been adequately addressed."

**4.** SHAB stated the following in a footnote to its conditional language: "[t]o the extent that such approvals are, in any instances, administered by state or local officials, procurement of approval from those officials are included as a condition but only as to such approvals."

pursuant to § 45–53–5, appealing SHAB's oral ruling of October 12, 2004. *See Coventry Zoning Board of Review v. Omni Development Corp.*, 814 A.2d 889, 897 (R.I. 2003) (holding that a zoning board has standing to appeal from a SHAB decision only when "the town council, acting through its solicitor * * * intervene[s] as a party before this Court").[5]

## II

## The Low and Moderate Income Housing Act

### A. The Applicable Version of the Act

 We first determine the applicable law under which this Court shall review the town's appeal from SHAB. Although this issue is not in dispute,[6] we find it fitting to underscore the statutory language that applies to the disposition of this case in light of amendments to the act in 2004 and 2005. *See JCM, LLC v. Cumberland Zoning Board of Review*, 889 A.2d 169, 172–73 (R.I.2005) (determining the applicable law even though neither party contested SHAB's application of the pre-amendment act). For this Court to interpret a statute as retroactive, the General Assembly must make a clear expression of retroactive application. *Pion v. Bess Eaton Donuts Flour Co.*, 637 A.2d 367, 371 (R.I.1994). In *Kaveny v. Cumberland Zoning Board of Review*, 875 A.2d 1, 4–5 (R.I.2005), we declined to retroactively apply various amendments to the act in our analysis of the matter then before us be-

cause the amendments lacked the requisite clear expression of retroactive application. We therefore applied the law in effect at the time when the applicant-developer submitted its application for a permit to the zoning board. *Id.*; *see also JCM, LLC*, 889 A.2d at 172–73 (applying *Kaveny* to ascertain the applicable version of the statute). In the instant case, all 2004 and 2005 amendments to the act became effective after East Bay submitted its application to the zoning board, on August 27, 2003. Accordingly, we shall review the town's appeal under the pre-amendment act.[7]

### B. The Operation of the Pre-Amendment Version of the Act

The General Assembly passed the Low and Moderate Income Housing Act in 1991 as a measure to address the "acute shortage of affordable, accessible, safe, and sanitary housing for its citizens of low and moderate income." Section 45–53–2. The aspirational language of the act continues by declaring that it is "imperative that action is taken immediately to assure the availability of affordable * * * housing for these persons" as a measure "necessary to assure the health, safety, and welfare of all citizens of this state." *Id.* The General Assembly placed the burden of achieving this urgent goal upon the cities and towns of the state to "provide opportunities for the establishment of low and moderate income housing." *Id.*

---

5. On December 8, 2004, the town council and zoning board filed a supplemental notice of appeal seeking review of SHAB's written decision of November 8, 2004. However, we need not comment upon the timeliness of the town's supplemental notice of appeal because the notice of appeal filed on November 1, 2004, although premature, was valid. *See Dovenmuehle Mortgage, Inc. v. Antonelli*, 790 A.2d 1113, 1114 n. 1 (R.I.2002).

6. Although SHAB's decision does not explicitly note the version of the act under which it analyzed the zoning board's decision, it appears that SHAB applied the pre-amendment act.

7. To the extent that we refer to the version of the act now in effect by virtue of amendments effective after the date that East Bay filed its application, we shall explicitly state as such.

Recently, this Court has addressed thoroughly the operational components of the act in *Omni Development Corp.* There, construing the clear and unambiguous language of § 45–53–4, we wrote that the act "provides for a streamlined and expedited application procedure whereby 'a single application for a [comprehensive permit] to build [low and moderate income] housing in lieu of separate applications to the applicable local [municipal] boards' may be submitted to the zoning board of review of a city or town."[8] *Omni Development Corp.*, 814 A.2d at 894 (quoting § 45–53–4). Section 45–53–4 requires the zoning board to notify each applicable local board immediately upon receipt of an application, and thereafter hold a public hearing on the application within thirty days. The zoning board then must "render a decision, based upon a majority vote of the board, within forty (40) days after the termination of the public hearing." Section 45–53–4. Applications for which the zoning board has held no public hearing or has failed to make a decision within forty days are "deemed to have been allowed and the approval shall issue immediately." *Id.*

The provisions of the act confer upon the zoning board considerable powers in granting an application for a permit. In *Omni Development Corp.*, we noted that "a zoning board, when passing upon an application * * * is not merely performing its limited statutory duties, but rather is vested with significant discretion and responsibility to act in the best interest of the community." *Omni Development*

Corp., 814 A.2d at 897. Indeed, § 45–53–4 provides that the zoning board:

"has the same power to issue permits or approvals that any local board or official who would otherwise act with respect to the application, including, but not limited to, the power to attach to the permit or approval, conditions, and requirements with respect to height, site plan, size, or shape, or building materials, as are consistent with the terms of this section."[9]

Those "aggrieved" by a zoning board's decision to issue an approval may appeal directly to this Court. Section 45–53–4; *see, e.g., Kaveny*, 875 A.2d at 1 n. 1 (appeal of abutting landowners). A party aggrieved by the issuance of a permit with conditions also may appeal, but the avenue of the appeal depends upon the status of the aggrieved party. *Compare Kaveny*, 875 A.2d at 1 n. 1 (direct appeal of *remonstrants* to this Court by virtue of § 45–53–4), *with Omni Development Corp.*, 814 A.2d at 893–94 (procedural posture involving a *town's* appeal to this Court after an *applicant's* appeal to SHAB by virtue of § 45–53–5).

█ The act is more circumscribed with respect to the zoning board's ability to deny an application. Section 45–53–4 provides that a zoning board may deny an application only if based on one or more of the following four grounds:

"[1] if the proposal is inconsistent with local needs * * *; [2] if the proposal is not in conformance with the comprehen-

---

8. The General Assembly amended § 45–53–4 in June 2002, replacing the term "special exception" with "comprehensive permit." *See* P.L. 2002, ch. 416, § 1; *see also Kaveny v. Cumberland Zoning Board of Review*, 875 A.2d 1, 9–11 (R.I.2005) (addressing constitutional claims brought in the wake of this amendment).

9. Section 45–53–3(4) defines local board to mean "any town or city zoning board of review, planning board or commission, platting board of review, or building inspector; or the officer or board having supervision of the construction of buildings or the power of enforcing municipal building, subdivision, or zoning laws; or the city council or town council."

sive plan; [3] if the community has met or has plans to meet the standard of ten percent (10%) of the units * * *; or [4] if concerns for the environment and the health and safety of current residents have not been adequately addressed."[10] Moreover, a zoning board that denies an application based on one or more of these grounds must support its decision with sufficient "findings of fact and reasons for the actions taken." *JCM, LLC,* 889 A.2d at 176 (quoting *Kaveny,* 875 A.2d at 8).[11] If a zoning board denies an application, or grants a permit with conditions that make the development of affordable housing infeasible, the applicant may appeal to SHAB pursuant to § 45–53–5. SHAB must then, under the dictates of § 45–53–5, notify the zoning board of the appeal "immediately," hold a hearing within twenty days after receipt of the applicant's statement, and "render a written decision and order, based upon a majority vote" within thirty days after the termination of said hearing. *See also Union Village Development Associates v. North Smithfield Zoning Board of Review,* 738 A.2d 1084, 1085–86 (R.I.1999) (holding that § 45–53–5 requires a majority vote of the *full* membership of SHAB). SHAB's written decision must state "its findings of fact, and its conclusions and the reasons for those conclusions." Section 45–53–5.

■ This Court previously has articulated the statutory standard of review SHAB must apply in passing upon an applicant's appeal from an adverse decision of a zoning board. In *Omni Development Corp.,* we read § 45–53–6(a) to provide expressly that: "[i]n hearing the appeal, [SHAB] shall determine whether, in the case of the denial of an application, the decision of the zoning board of review was *reasonable and consistent with local needs* * * *." *Omni Development Corp.,* 814 A.2d at 898 (quoting § 45–53–6(a)). (Emphasis added.) As we recently explained in *JCM, LLC,* a case that examined and applied this Court's ruling in *Omni Development Corp.,* the threshold inquiry into whether a zoning board's decision to deny an application based on a zoning or land use regulation is "consistent with local needs" essentially depends upon whether the municipality meets the "statutory quota for low and moderate income housing units." *JCM, LLC,* 889 A.2d at 174 (quoting *Omni Development Corp.,* 814 A.2d at

**10.** An amendment to § 45–53–4 in 2004 (P.L. 2004, ch. 324, § 11) added a fifth ground to the zoning board's ability to deny an application: "if city or town has an approved affordable housing plan and is meeting housing needs, and the proposal is inconsistent with the affordable housing plan." *See* § 45–53–4(a)(4)(vii)(A). The amended version nevertheless retains the ground allowing a denial if "the proposal is not in conformance with the comprehensive plan." Section 45–53–4(a)(4)(vii)(C).

**11.** This Court has required zoning boards to support their findings of fact with "[s]ubstantial and competent evidence," even though the language of the applicable version of the statute required that the zoning board only "render a decision." *Compare Curran v. Church Community Housing Corp.,* 672 A.2d 453, 455 (R.I.1996) (holding that "[s]ubstan-

tial and competent evidence exists to support the [zoning] board's finding that the project is consistent with local needs"), *with* § 45–53–4 (requiring that zoning board merely "render a decision"); *see also JCM, LLC v. Cumberland Zoning Board of Review,* 889 A.2d 169, 176 (R.I.2005) (requiring "[d]etailed and informed findings of fact"); *Kaveny,* 875 A.2d at 8 (requiring "sufficient findings of fact"). Amendments to § 45–53–4 in 2004 since have transformed our common-law rule into a statutory requirement: "the local review board shall make positive findings, supported by legally competent evidence on the record which discloses the nature and character of the observations upon which the fact finders acted * * *." *See* § 45–53–4(a)(4)(v), as amended by P.L. 2004, ch. 286, § 11 and P.L. 2004, ch. 324, § 11.

899). We held in *JCM, LLC* that the zoning or land use ordinance, requirement, or regulation underlying a zoning board's decision to deny an application is: [12]

> "conclusively deemed consistent with local needs when 'imposed by a city or town council after a "comprehensive hearing," *and* that community has met or exceeded its statutory minimum for low and moderate income housing units; *and* has adopted a comprehensive plan that includes a housing element that addresses the need for low and moderate income housing for that community.' " *JCM, LLC*, 889 A.2d at 174 (quoting *Omni Development Corp.*, 814 A.2d at 898–99) (construing § 45–53–3(2)).

In municipalities for which this conclusive presumption applies, SHAB has no statutory authority to vacate, modify, reverse, or otherwise manipulate the decision of the zoning board. *Id.*; *Omni Development Corp.*, 814 A.2d at 899.

SHAB must apply a higher level of scrutiny, however, to the decisions of municipalities that have failed to meet the statutory requirement, imposed upon them by negative implication in § 45–53–3(2)(i), to have affordable housing that "is in excess of ten percent" of the municipality's total housing units.[13] *See JCM, LLC*, 889 A.2d at 174; *Omni Development Corp.*, 814 A.2d at 899. Without the benefit of the conclusive presumption, SHAB must apply the analysis housed in the statutory definition of "[c]onsistent with local needs:"

"local zoning or land use ordinances, requirements, and regulations are considered consistent with local needs if they are reasonable in view of the state need for low and moderate income housing, considered with the number of low income persons in the city or town affected and the need to protect the health and safety of the occupants of the proposed housing or of the residen[ts] of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces, and if the local zoning or land use ordinances, requirements, and regulations are applied as equally as possible to both subsidized and unsubsidized housing." Section 45–53–3(2).

We elaborated in our *Omni Development Corp.* opinion that "it is incumbent upon SHAB to examine the decision *and* the [local requirement] on which it rests and determine whether the [local requirement] is reasonable in light of the state's need for low income housing." *Omni Development Corp.*, 814 A.2d at 899. A local requirement is reasonable, this Court continued, "if it is not designed or intended to exclude low and moderate income residents from the community or to discourage or frustrate the likelihood of success of a project." *Id.*

Coming full circle, SHAB must examine the illustrative standards set forth in § 45–53–6(b). *JCM, LLC*, 889 A.2d at 174–75; *Omni Development Corp.*, 814 A.2d at 901. These factors "include, but are not limited to," the following:

---

**12.** We shall hereinafter refer to a "local zoning or land use ordinance[ ], requirement[ ], [or] regulation[ ]" found in § 45–53–3(2) as a "local requirement." We do so simply as a matter of convenience, and, by doing so, in no way limit the purview of § 45–53–3(2).

**13.** The act requires a higher threshold than 10 percent in circumstances not present in the instant case. For example, § 45–53–3(2)(i)(A) notes that, "in the case of an urban city or town which has at least 5,000 occupied rental units and the units, as reported in the latest decennial census of the city or town, comprise twenty-five percent (25%) or more of the housing units, [that city or town must possess affordable housing] in excess of fifteen percent (15%) of the total occupied rental units."

"(1) The consistency of the decision to deny or condition the permit with the approved comprehensive plan;

"(2) The extent to which the community meets or plans to meet the ten percent (10%) standard for existing low and moderate income housing units;

"(3) The consideration of the health and safety of existing residents;

"(4) The consideration of environmental protection; and

"(5) The extent to which the community applies local zoning ordinances and special exception procedures evenly on subsidized and unsubsidized housing applications alike." Section 45–53–6(b).[14] As this Court pronounced in *Omni Development Corp.*, and reiterated in *JCM, LLC*, the above factors are in addition to the reasonableness analysis contained in § 45–53–3(2)'s definition of "[c]onsistent with local needs." *JCM, LLC*, 889 A.2d at 174; *Omni Development Corp.*, 814 A.2d at 901. We were mindful in *Omni Development Corp.*, and are still, of the degree of overlap between the reasonableness

analysis of § 45–53–3(2) and the illustrative factors of § 45–53–6(b), noting that the latter largely mirror the former. *Omni Development Corp.*, 814 A.2d at 901. For municipalities lacking the statutory quota, however, the act calls upon SHAB to conduct an analysis under both subsections. *JCM, LLC*, 889 A.2d at 174; *Omni Development Corp.*, 814 A.2d at 901.

## C. The Town's Due–Process and Equal–Protection Challenges

 The town argued vigorously at the SHAB hearing, and before us at oral argument, that SHAB's statutorily required standard of review violates the guarantees of equal protection and due process of both section 1 of the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution.[15] The town points to the deferential standard with which this Court reviews decisions of zoning boards granting permit applications with or without conditions when an appeal is brought

**14.** Under the current version of the act, these factors are enumerated with slight alteration in § 45–53–6(c), as amended by P.L. 2004, ch. 286, § 10.

**15.** We briefly address a procedural requirement that litigants challenging the constitutionality of a state statute often ignore. Article I, Rule 32(b) of the Supreme Court Rules of Appellate Procedure requires a party, such as the town in the matter before us, that "draws in[to] question the constitutionality * * * of any Act of the General Assembly of Rhode Island * * * [to] give immediate notice in writing to the Supreme Court of the existence of said question." With notice in hand, the clerk, in turn, notifies the Attorney General, who then may take such action as he or she deems appropriate after reflecting upon the issues involved. *See* Art. I, Rule 32(b). In *Kaveny*, we noted that, because of the *sui generis* operation of the act, allowing litigants to take an "abbreviated route to our courtroom—without the customary visit to Superi-

or Court—adherence to Rule 32(b) is of particular importance because of the likelihood that cases such as this one otherwise might escape the Attorney General's cognizance." *Kaveny*, 875 A.2d at 9n.7. There, although we ultimately upheld the act against the party's constitutional challenges, we expressed strongly our view that parties "should endeavor to achieve more zealous compliance" with the tenets of Rule 32(b). *Kaveny*, 875 A.2d at 9n.7, 10–12; *see also Power v. City of Providence*, 582 A.2d 895, 901 n. 6 (R.I.1990) (declining to dismiss a constitutional claim despite noncompliance with applicable notice rules when the Court's decision upheld the statute in question, but noting that, had the Court determined otherwise, the claim would have been dismissed). Although we likewise address the town's constitutional arguments notwithstanding its failure to comply with Rule 32(b), we reiterate our entreaty in *Kaveny* "[g]iven the drastic remedy for failing to comply with these rules." *Kaveny*, 875 A.2d at 9 n. 7.

by aggrieved parties pursuant to § 45–53–4. The standard of review SHAB must employ under §§ 45–53–6 and 45–53–3(2), on the other hand, is much less deferential to the zoning board of a municipality that has not reached its statutory quota under the act, such as the town in the present case. Thus, the town argues that the "differential appellate treatment of opposing parties within the same dispute" violates the above-indicated constitutional provisions.

■ The town's argument essentially decries the different standards of review a zoning board receives from appellate bodies under the act that, as we summarized in Part II.B of this opinion, is a function of the divergent avenues of appeal available to aggrieved parties based on their particular status in the case. Section 45–53–4, as we have stated, provides a mechanism by which an aggrieved party may file a direct appeal to this Court. Although the act does not set forth a standard by which this Court must review such direct appeals, our case law applies an especially deferential review analogous to that applied by the Superior Court in passing upon appeals from local zoning boards pursuant to G.L.1956 § 45–24–69. *Kaveny*, 875 A.2d at 7–8; *Curran*, 672 A.2d at 454–55. Our review does not give this Court license to "substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact." *Curran*, 672 A.2d at 454 (quoting § 45–24–69(d)). Further, this Court may reverse the decision of the zoning board only "in the event that the decision violated constitutional or statutory provisions, that it was made in excess of statutory authority or made upon an unlawful procedure or error of law, was clearly erroneous

in view of the evidence, or was [otherwise] arbitrary or capricious." *Id.* at 454–55 (quoting *United Cerebral Palsy of Rhode Island v. Town of Johnston*, No. 95–116–A. (mem., R.I. filed Mar. 23, 1995)).

As this Court explained in *Omni Development Corp.*, 814 A.2d at 898, our manner of review in such cases is distinct from SHAB's standard of review in passing upon a zoning board's denial or conditional approval of an application, brought by an applicant pursuant to § 45–53–6. In *Omni Development Corp.*, the town argued that, under our holding in *Curran*, 672 A.2d at 454–55, SHAB must apply the same deferential review that this Court employs when reviewing a direct appeal from a zoning board. *Omni Development Corp.*, 814 A.2d at 898. We rejected the town's argument, holding that the act expressly requires SHAB to conduct specific inquiries under §§ 45–53–6 and 45–53–3(2), and that the degree of scrutiny under these sections depends upon whether the town has met its statutory quota. The deferential review annunciated in *Curran*, we continued, applied to *our* review of SHAB's decisions as well as the decisions of a zoning board before us on direct appeal, but not to SHAB's review of the same.[16] *Omni Development Corp.*, 814 A.2d at 898. The town's contention in the present case is that these admittedly dissimilar standards embody "differential appellate treatment" that rises to the level of a constitutional deprivation. We disagree.

■ Faced with a challenge to the constitutional validity of an act of the General Assembly, we begin our analysis with the presumption that the legislative enactment is constitutional. *Gem Plumbing & Heating Co. v. Rossi*, 867 A.2d 796, 808

---

**16.** Accordingly, we reject the town's statutory construction argument, identical to that raised by the town in *Coventry Zoning Board* *of Review v. Omni Development Corp.*, 814 A.2d 889, 898–99 (R.I.2003), as settled law, with reference to the aforementioned case.

(R.I.2005). The General Assembly possesses the broad and plenary power to make and enact law, "save for the textual limitations * * * that are specified in the Federal or State Constitutions." *Cherenzia v. Lynch,* 847 A.2d 818, 822 (R.I.2004) (quoting *City of Pawtucket v. Sundlun,* 662 A.2d 40, 44 (R.I.1995)). As such, this Court will not invalidate a statute on constitutional grounds "unless the challenging party can prove beyond a reasonable doubt that the statute at issue is repugnant to a provision of the Rhode Island Constitution." *Ruggiero v. City of Providence,* 889 A.2d 691, 697 (R.I.2005). Further, "this [C]ourt will make every reasonable intendment in favor of the constitutionality of a legislative act, and so far as any presumption exists it is in favor of so holding." *State v. Garnetto,* 75 R.I. 86, 94, 63 A.2d 777, 781 (1949).

The town calls upon this Court to calibrate the applicable sections of the act, as written by the General Assembly and applied in the case at hand, against the due-process and equal-protection guarantees of both the federal and state constitutions. Because article 1, section 2, of the Rhode Island Constitution is parallel to section 1 of the Fourteenth Amendment, we conduct a hybrid analysis that nevertheless reflects the autonomous character of each constitution's inviolable guarantees. *Providence Teachers' Union Local 958, AFL–CIO, AFT v. City Council of Providence,* 888 A.2d 948, 956 (R.I.2005) (noting that the drafters of the 1986 Rhode Island Constitution created an independent state foundation for individual rights presumably in case the federal judiciary should adopt a more narrow interpretation of the Fourteenth Amendment). The substantive component of due process "guards against arbitrary and capricious government action." *Brunelle v. Town of South Kingstown,* 700 A.2d 1075, 1084 (R.I.1997). To prevail on such a claim, a successful litigant must show that the statute in question violates a constitutionally protected liberty or property interest or that the General Assembly's implementation of the statute was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Cherenzia,* 847 A.2d at 826 (quoting *Brunelle,* 700 A.2d at 1084); *accord Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Concerning equal protection, "[i]t is well established that where it has not been shown that a 'fundamental right' has been affected or that the legislation sets up a 'suspect classification,' a statute will be invalidated * * * only if the classification established bears no reasonable relationship to the public health, safety, or welfare." *Kaveny,* 875 A.2d at 11 (quoting *Sweetman v. Town of Cumberland,* 117 R.I. 134, 151, 364 A.2d 1277, 1288 (1976)).

The town has failed, in the present case, to provide *any* rationale to support its assertion that the act's provisions for appellate review violate either of the constitutional protections of either constitution, much less a rationale that establishes that point beyond a reasonable doubt. Beyond positing the mere observation that the procedure is "differential," which this Court already recognized in *Omni Development Corp.,* 814 A.2d at 898, the town directs our attention to four opinions of other states.[17] These cases, however, are distin-

---

17. *See Legates v. Heverin,* 196 A.2d 403, 405 (Del.Super.Ct.1962) (analyzing a statute that sets a party's right of appeal based on the amount in controversy); *People v. Sholem,* 238 Ill. 203, 87 N.E. 390, 392 (1909) (analyz-ing an Illinois inheritance tax law); *Green v. Red Cross Medical Service Co.,* 232 Ill. 616, 83 N.E. 1081, 1082 (1908) (analyzing a provision of an Illinois practice act); *Hecker v. Illinois*

guishable and do not address a statute in any way similar to the act at issue here.[18] In crafting the Low and Moderate Income Housing Act, the General Assembly designed a unique and sometimes intrusive standard that SHAB must apply in reviewing a zoning board's decision to deny an application. This standard, provided in §§ 45-53-6 and 45-53-3(2) as a carveout to the customary review of zoning board appeals, requires SHAB to scrutinize a zoning board's denial of an application when the municipality in question has failed to reach its statutory quota of affordable housing, as in the case before us. When the municipality has satisfied that quota, however, and thus has met the purposes behind the act as set forth in § 45-53-2, SHAB's standard decidedly is less harsh. We cannot say that the act, a fundamental component of which is SHAB's suspicious eye vis-à-vis recalcitrant municipalities, violates the constitutional provisions invoked by the town in light of the imperative considerations involved at the act's birth. The state un-

questionably has a legitimate interest, if not a substantial one, in addressing the housing needs of its impecunious citizenry. *See Kaveny,* 875 A.2d at 10–11 (holding similarly, but in answer to less focused constitutional challenges). Nor can we say that the act is unrelated to the health, safety, or welfare of the individuals and families that the General Assembly sought to affect through its enactment. *See id.* Consequently, the town's due-process and equal-protection challenges must fail.

## III

## The SHAB Decision

■ Our review of SHAB decisions is governed by the same standard by which we review the decisions of zoning boards. *Omni Development Corp.,* 814 A.2d at 898. "This Court will reverse a SHAB decision [only] if it 'violates constitutional or statutory provisions, was made in excess of statutory authority or upon error of law, or was otherwise clearly erroneous in view of the evidence or was otherwise arbitrary

*Cent. R. Co.,* 231 Ill. 574, 83 N.E. 456, 457–58 (1907) (same).

**18.** The Massachusetts General Assembly passed an act entitled "Low and Moderate Income Housing" in 1969 in response to a similar affordable-housing crisis. *See* Mass. Gen. Laws ch. 40B, §§ 20–23 (1969). The Massachusetts act, colloquially referred to as chapter 40B, was the first of its kind in the United States, and was a precursor of Rhode Island's act at issue before us. *See Zoning Board of Appeals of Wellesley v. Ardemore Apartments Limited Partnership,* 436 Mass. 811, 767 N.E.2d 584, 592 n. 20 (2002) (noting that only Rhode Island and Connecticut had enacted statutes modeled after chapter 40B); Nancy E. Giorgi, *Instructions for Review of "Comprehensive Permits" Under the Rhode Island Low and Moderate Income Housing Act,* Rhode Island Bar Journal 7 (Jan./Feb. 2004) (noting that Rhode Island's act "has been touted as a copy of its Massachusetts precursor"). Indeed, Rhode Island's act contains a

quantity of language identical to that contained in its Massachusetts precursor and is otherwise similar to it in many significant respects not at issue in this case.

Given the long life of chapter 40B in our neighboring state, the Supreme Judicial Court of Massachusetts (SJC) has had the opportunity to address thoroughly the operation of that statute in the context of many disputes, including challenges to its constitutional viability. In *Board of Appeals of Hanover v. Housing Appeals Committee,* 363 Mass. 339, 294 N.E.2d 393, 416 (1973), for example, widely considered the seminal case interpreting chapter 40B, the SJC rejected an argument, similar to the one that the town raises in the matter before us, challenging on equal protection grounds the various and seemingly divergent standards of review created by the statute. *See also Mahoney v. Board of Appeals of Winchester,* 366 Mass. 228, 316 N.E.2d 606, 608–09 (1974) (examining and applying Hanover to an identical, but reverse, equal-protection challenge).

or capricious.'" *Housing Opportunities Corp. v. Zoning Board of Review of Johnston*, 890 A.2d 445, 449 (R.I.2006) (quoting *Omni Development Corp.*, 814 A.2d at 898).

## A. A Plan as a Local Zoning or Land Use Ordinance, Requirement, or Regulation

The analytical component of SHAB's decision began by determining the standard under which the act required it to review the decision of the zoning board. Referring to our opinion in *Omni Development Corp.*, SHAB recognized the zoning board's tacit admission that the town had only 1.48 percent affordable housing units of the town's total units ascertained in the last decennial census. Nor did the town have a strategy in place at that time, through its plan or otherwise, to reach the applicable statutory quota of 10 percent affordable-housing units. SHAB, therefore, found that the conclusive presumption did not apply in the case before it and proceeded to resolve the reasonableness of the zoning board's decision pursuant to § 45–53–3(2).

SHAB concluded as an initial matter, over the town's objections, that the provision of the town's plan upon which the zoning board relied in denying East Bay's application was, in fact, a local requirement as provided in the act. *See* § 45–53–3(2) ("[L]ocal zoning or land use ordinances, requirements, and regulations are considered consistent with local needs if they are reasonable * * *."). Specifically, SHAB identified the provisions of the town's plan designating the site for either business use or elderly housing. SHAB recognized that while comprehensive plans may be employed as mere planning tools, those plans also may dictate the contents of local requirements. Indeed, SHAB pointed out that § 45–24–34 requires

towns to amend their zoning ordinances to conform to their comprehensive plans and, further, that towns adopt such plans in the same manner in which they adopt zoning ordinances. *See* G.L.1956 § 45–22.2–8. Moreover, SHAB continued, this Court previously has rejected the argument that plans are not local requirements in *Town of East Greenwich v. Narragansett Electric Co.*, 651 A.2d 725 (R.I.1994).

■■■ The town, conceding as it must that it has failed to satisfy its statutory quota for affordable housing under the act, argues instead that East Bay nevertheless failed to raise before SHAB the issue that the town's plan was a local requirement under § 45–53–3(2). East Bay's critical omission, the town argues, precluded SHAB from addressing the issue *"sua sponte"* without violating the raise-or-waive doctrine and the due-process protection against inadequate notice. Even if these procedural protections do not apply, the town argues in the alternative, this Court has made clear in case law subsequent to *Narragansett Electric Co.* that the provisions of a plan are not equivalent to zoning ordinances. For the limited purpose of disposing of the town's alleged errors of law, we remove ourselves from the customary and deferential standard we articulated *supra* and address these arguments *de novo*. *Carnevale v. Dupee*, 783 A.2d 404, 408 (R.I.2001) ("Questions of law, * * * including questions of statutory interpretation, are reviewed *de novo* by this Court.").

■■■ It is well settled that we "will not consider on appeal an issue that was not raised before the trial court." *Harvey Realty v. Killingly Manor Condominium Association*, 787 A.2d 465, 466–67 (R.I.2001) (quoting *Rhode Island Depositors Economic Protection Corp. v. Rignanese*, 714 A.2d 1190, 1196–97 (R.I.1998)). "Not only does the [raise-or-waive doctrine] serve ju-

dicial economy by encouraging resolution of issues at the trial level, it also promotes fairer and more efficient trial proceedings by providing opposing counsel with an opportunity to respond appropriately to claims raised." *State v. Burke*, 522 A.2d 725, 731 (R.I.1987). This Court has not explicitly held that the raise-or-waive doctrine applies to administrative proceedings, let alone the inimitable procedures provided in the act at issue here. Yet we need not decide that issue today to dispose of the town's argument. It is worth repeating that the act envisions distinct roles for the zoning board (set out in § 45–53–4) and for SHAB (explained in §§ 45–53–6 and 45–53–3(2)) during the evaluation of an application brought under the act. For cases involving towns that have failed to satisfy their statutory quota, § 45–53–3(2) *requires* SHAB to assess the reasonableness of the local requirement that the zoning board relied upon in denying an applicant's application. *Omni Development Corp.*, 814 A.2d at 899; *see also Donnelly v. Town of Lincoln*, 730 A.2d 5, 9 (R.I. 1999) (holding that the raise-or-waive doctrine did not bar this Court from reviewing an issue raised for the first time on appeal because a statute automatically provided for that issue). We did not indicate in *Omni Development Corp.*, nor do we hold in this case, that § 45–53–3(2) in any way excuses SHAB from this determination except for when the municipality in question has satisfied § 45–53–3(2)(i)–(ii). *See JCM, LLC*, 889 A.2d at 174–75 (holding that a town must qualify under both subsections (2)(i) and (2)(ii) of § 45–53–3 to receive the conclusive presumption articulated in *Omni Development Corp.*). Our application of the raise-or-waive doctrine in the present case, which would require applicants to advance an argument before a zoning board the resolution of which the act exclusively allocates to SHAB, would make little practical sense—if not vitiate

§ 45–53–3(2) and abrogate our holding in *Omni Development Corp.* We need not and do not consider (or reconsider) the subject of the extent to which the raise-or-waive doctrine applies, if at all, to other issues raised during the course of an appeal under the act, or in other quasi-judicial contexts. It is enough that we are satisfied that the town's position as presented to us lacks merit in the circumstances of the present case.

■■■ For similar reasons, we reject the town's argument that SHAB, in applying analyses required by provisions of the act, violated the town's procedural due-process rights. Procedural due process guards against the modalities of state action, addressing itself to the task of rectifying perceived procedural deficiencies. *See, e.g., L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202, 210–11 (R.I. 1997). In the civil context, procedural due-process "analysis involves * * * looking at whether a litigant was afforded the fair-play notions of proper notice and the right to a hearing." *In re Advisory Opinion to the House of Representatives Bill 85–H–7748*, 519 A.2d 578, 581 (R.I.1987). "[P]rocedural due[ ]process requires certain minimal standards of notice, hearing, and opportunity to respond adequately before a governmental agency may effectively deprive an individual of life, liberty, or property." *State v. Manocchio*, 448 A.2d 761, 764 n. 3 (R.I.1982); *see also Fuentes v. Shevin*, 407 U.S. 67, 80–81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). We are unpersuaded that the town suffered a deprivation of these rights given the clear and unambiguous language of §§ 45–53–6 and 45–53–3(2) and our amplification of SHAB's analytical responsibilities under those provisions in *Omni Development Corp.*, which this Court issued five months before East Bay filed its application with the zoning board. *See Omni Development*

*Corp.,* 814 A.2d at 898–99. The town's contention that it somehow was prohibited from having an adequate opportunity to research applicable case law, if not entirely zealous exaggeration, falls far short of a due-process violation under the circumstances of the present case.

■■■ The town's alternate argument that SHAB erred in concluding that the town's plan was a local requirement also must fail under our *de novo* review. In *Narragansett Electric Co.,* this Court refused to quash an order of the Public Utilities Commission (PUC) that invalidated certain amendments that East Greenwich had made to its comprehensive plan to limit the exposure of electromagnetic fields emanating from the construction of new high voltage power lines within the boundaries of that town. *Narragansett Electric Co.,* 651 A.2d at 727. We noted that the PUC had the authority, pursuant to statute, to invalidate "[e]very ordinance enacted, or regulation promulgated by any town or city affecting the mode or manner of operation or the placing or maintenance of the plant and equipment of any company under the supervision of [PUC] * * *." *Id.* (quoting G.L.1956 § 39–1–30). In rejecting East Greenwich's argument that its comprehensive plan was not an "ordinance enacted, or regulation promulgated," but rather was merely a statement of long-range goals, we held that "a comprehensive plan is not simply [an] innocuous general-policy statement." *Id.* Instead, we said it was "a binding framework or blueprint that dictates town and city promulgation of conforming zoning and planning ordinances." *Id.* Consequently, the local interests embodied in that town's amendment to its comprehensive plan yielded to the state's interest in the uniform conduct of public utilities, the authority for which rested exclusively in the PUC by statute.

*Id.* at 729 (citing *Town of East Greenwich v. O'Neil,* 617 A.2d 104, 110 (R.I.1992)).

■■■ Our reasoning in *Narragansett Electric Co.* is instructive with respect to the analogous context before us. The act essentially delegates to SHAB the authority to override unreasonable local requirements, the overly strict application of which frustrate the development of affordable housing in municipalities that need it most. *See Omni Development Corp.,* 814 A.2d at 899–900 (saying that SHAB's determination that a local requirement is not consistent with local needs effectively overrides that local requirement by allowing the permit to be issued in spite of it). Much like East Greenwich in *Narragansett Electric Co.,* the town in the present case argues that labeling a restrictive measure a "plan" allows municipalities to evade the scrutiny that § 45–53–3(2) otherwise demands. Such a holding effectively would cancel SHAB's prerogative under the act to prod hesitant municipalities, lacking satisfaction of the statutory quota, into compliance with the act. This Court will not endorse an interpretation of § 45–53–3(2) that would defeat the underlying legislative purpose of the act expressed in its provisions and acknowledged in our case law. *See, e.g., In re Falstaff Brewing Corp. Re: Narragansett Brewery Fire,* 637 A.2d 1047, 1050 (R.I.1994) (rejecting an interpretation of a statute that would permit parties to bring a civil suit for damages but deny them the tools for obtaining that relief).

We also find that the town's reliance on *P.J.C. Realty, Inc. v. Barry,* 811 A.2d 1202 (R.I.2002), is misplaced. There, this Court held that the Superior Court lacked jurisdiction to issue a writ of mandamus directing a municipal council to amend its zoning regulations in conformance with its comprehensive plan. *Id.* at 1206–07. We distinguished *Nar-*

ragansett Electric Co. from the matter then before us, however, because the statutory context at issue in *P.J.C. Realty, Inc.* did not include an express authorization to review the failure of a municipal council to enact an amendment to its zoning regulations. *P.J.C. Realty, Inc.*, 811 A.2d at 1206–07. In the present case, which we relate much more to *Narragansett Electric Co.* than to *P.J.C. Realty, Inc.*, the act specifically confers on SHAB the authority to ascertain the reasonableness of a particular local requirement, which may or may not ultimately result in the removal of that local requirement as an obstacle to the development in question. *Omni Development Corp.*, 814 A.2d at 899–900.

We are satisfied that, to the extent that the town relied upon a provision in its plan to foreclose the development of affordable housing in this case, SHAB correctly determined that the provision was a local requirement under § 45–53–3(2). Our holding does not require that we decide whether *all* plans in *every* respect are local requirements under § 45–53–3(2), a proposition that may be as irrelevant as it is unnecessary for our disposition of this case. The town's reliance on it's plan in denying East Bay's application, however, is enough for SHAB to assess the reasonableness of the obstacles to affordable housing that the plan contains.

### B. The Reasonableness of the Local Requirement

■ After SHAB found that the provision of the town's plan reserving the site for business use or housing for the elderly was a local requirement, SHAB proceeded to determine whether that local requirement was reasonable. SHAB's analysis primarily focused on two of the zoning board's findings. One finding, listed first in cardinal order of the zoning board's findings, declared: "[a]pplication does not conform to Comprehensive Plan for the Town of Barrington." The other finding, listed fifth and seemingly providing a rationale for the first finding, said: "application does not meet the Comprehensive Plan because the Plan calls for business or elderly housing use for the site." [19]

SHAB's decision repudiated as inadequate a number of the town's arguments to support its local requirement, arguments that the town simply reiterates on appeal to this Court. First, the argument that the town needed to reserve lot No. 110, which comprised the vast majority of the site, to expand the town's economic base, *i.e.*, increase the town's tax revenues, was unpersuasive when measured against the town's failure to have satisfied its statutory quota of affordable housing. Moreover, SHAB noted that lot No. 110 has remained vacant for three decades, is surrounded by residential neighborhoods, and does not have access to any major highways—factors making commercial demand for the site "extremely limited." SHAB also found that the use regulation prohibiting two-family dwellings in all but the diminutive percentage of the site zoned for "Neighborhood Business" (lot Nos. 106 and 147) frustrated the development of any consequential affordable housing on the site. The town also argued that the only alternative to business use for the site suggested in the plan was for elderly housing. SHAB's independent review of the record, however, failed to uncover a rational explanation for why the parcels were suitable for affordable elderly housing, as the town conceded, but not affordable *nonelderly* housing. Similarly, the plan's

19. The zoning board's decision also stated a nearly identical finding/conclusion that the application "[d]id not comply with Comprehensive Plan in that the Project was neither business nor elderly housing," in finding nine.

"preference" that affordable housing developments be scattered throughout the town, instead of being concentrated in the manner proposed by East Bay, was found to be "cost-prohibitive." Finally, SHAB could find no evidence in the record supporting the contention that the local requirement was related to the permissible considerations outlined in § 45–53–3(2), which included the health and safety of potential occupants or current residents, better building design, or preserving open space.

In light of these considerations, and delving into the long record accumulated during the zoning board's numerous hearings, SHAB determined that the local requirement was an unreasonable restraint on affordable housing. SHAB recognized the "extreme scarcity" of affordable housing units in the town—a consideration the zoning board's decision did not even mention. Despite the statewide housing crisis and the fact that 142 families and 566 people fell below the poverty line in the town in 1999, the town provided only ninety-two affordable housing units. Paraphrasing *Omni Development Corp.'s* language that a local requirement is unreasonable if it is designed "or intended to exclude low and moderate income residents from the community or to discourage or frustrate the likelihood of success of a project," *see Omni Development Corp.*, 814 A.2d at 899, SHAB concluded that the town's reliance on the local requirement was "patently unreasonable."

SHAB went on to determine that East Bay's application was consistent with the town's plan to the extent that the plan referred to affordable housing. For example, the housing element of the town's plan recognized the need for more affordable housing opportunities, but, at the same time, sought to retain the town's "detached single family dwelling unit * * * as the predominant housing type." The housing element also included the results of questionnaires submitted to the residents of the town, indicating that residents were amicable to affordable housing in the form of duplexes or triplexes that resembled single-family homes. Relying on this information in its application to the zoning board, East Bay posited that duplexes designed to resemble single-family homes, along with the incorporation of other aspects of the town's surrounding architectural archetype, would balance appropriately the town's need for affordable housing with the desire to maintain local character and quality of life. SHAB agreed, noting that East Bay carefully had designed the duplexes in a manner similar to the surrounding neighborhoods, much distinct from an imposing "monolithic block of apartments." *Cf. Housing Opportunities Corp.*, 890 A.2d at 446, 452 (affirming the denial of a permit to construct a three-story, 44,265 square-foot building in Johnston that would have constituted an increase in density of more than 650 percent in relation to the surrounding area).

In sum, SHAB determined that the town, lacking fulfillment of its statutory quota, unreasonably relied upon a local requirement that frustrated the development of much-needed affordable housing. In its decision, SHAB adequately evaluated the arguments presented by the parties and sufficiently searched the voluminous record for facts to support its conclusion. We are keenly aware that this is a troubling case; but, adhering to our customary standard of review, we are satisfied that SHAB did not make its determination in excess of statutory authority, nor was it clearly erroneous or otherwise arbitrary or capricious.

### C. Whether the Decision was Consistent with Local Needs

Having determined that the town's local requirement was unreasonable, SHAB

moved on to evaluate whether the zoning board's decision was consistent with local needs in light of the factors outlined in § 45–53–6. SHAB identified four issues, strewn over several of the zoning board's findings and sub-findings, on which the zoning board relied in denying East Bay's application. Those issues included a negative impact on public safety because of (1) increased traffic levels and (2) noncompliance with fire regulations; (3) the desire to maintain current density levels and preserve open space; and (4) the need for granite curbing.[20] Analyzing each issue, SHAB found that the record did not support the zoning board's findings with substantial evidence. We now proceed to address the issues challenged by the town on appeal, according deferential review to the factual findings of SHAB.

### 1. Traffic

■ The zoning board's decision lodged concerns over traffic safety into two separate findings, each derived from a particular ground for denial provided in § 45–53–4. First, two sub-findings to finding number six, pertaining to § 45–53–4's language that "health and safety of current residents have not been adequately addressed," provided as follows:

"6. Safety was not adequately addressed as follows:

"● The Applicant's traffic study lacked credibility because it was performed in the summer on one day when traffic would normally be light. There was no school or regular commuter traffic, or church traffic. Furthermore, construction and road repaving were being done in the area as well as in the area of Middle

Highway and Lincoln Avenue further reducing the traffic count. These roads are feeders to Washington Road.

"● Exhibit '18' was a prior traffic study done for another application on Bay Spring Avenue which contradicts the Applicant's study."

Second, in a sub-finding to finding number nine, the zoning board found that East Bay "failed to show project would meet local needs," in part because of the "[n]egative impact on public safety to surrounding area because of traffic."

SHAB's commentary proceeded systematically to discredit the competency of the evidence on which the zoning board relied in making the above findings. The sub-finding related to the conditions present at the time when the traffic study was conducted, SHAB said, and were based partly on the extemporaneous personal observations of zoning board members themselves. Based on its independent review of the record, SHAB found that the record did not explore or otherwise discuss the nature or character of the members' observations. In determining that these observations did not constitute legally competent evidence, SHAB correctly cited our opinion in *Restivo v. Lynch*, 707 A.2d 663 (R.I.1998). There, we held that the personal observations of municipal council members constituted legally competent evidence because the record disclosed the nature and character of those observations. *Id.* at 666. The record in *Restivo* reflected that two council members traveled to the site in question, familiarized themselves with the severity of a particular water drainage problem, and disclosed their visit in detail to the council. *Id.* at 667. As SHAB aptly

---

20. Because the town does not address SHAB's finding with respect to granite curbing on appeal, we deem the matter waived pursuant to Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure. *See Kaveny*, 875 A.2d at 10; *Wilkinson v. State Crime Laboratory Commission*, 788 A.2d 1129, 1131 n. 1 (R.I.2002).

noted in the present case, the record does not reflect that zoning board members engaged in any of the responsibilities on which the competency of the evidence in *Restivo* turned. *See also Perron v. Zoning Board of Review of Burrillville*, 117 R.I. 571, 576, 369 A.2d 638, 641 (1977) (rejecting as incompetent evidence the personal observations of zoning board members who visited the site in question but did not adequately disclose relevant observations on the record).

Further, SHAB determined that the reference in the sub-finding to the presence of construction in the area during July and August apparently was based on the comments of one spectator. During the hearing on October 29, 2003, the zoning board afforded members of the audience the opportunity to question East Bay's traffic expert. Betsy Bowman, a resident of the neighborhood, volunteered and the following colloquy ensued:

> "BETSY BOWMAN: My name is Betsy Bowman. I live on Walnut Road. Lincoln [Avenue] was under construction most of July and August. We live two houses from Lincoln [Avenue]. There were many days that the traffic was completely stopped. You couldn't even get through. And I was wondering if you were aware of this when you did your study?
>
> "THE WITNESS: No, I was not aware of that.
>
> "BETSY BOWMAN: Because that would have impacted any traffic coming off of Lincoln [Avenue] on to Washington [Road], especially as the traffic is not allowed to go through.

"THE WITNESS: Well, were they prohibited from passing through altogether or just delayed through the construction?

"BETSY BOWMAN: It was stopped completely at some point."

SHAB found that the comments of this single witness were "hardly sufficient to support the [zoning board's] sweeping findings" that reduced traffic somehow marginalized the traffic study. The vague assertion that construction *may* have existed that, in turn, *may* have affected the results of a traffic study simply did not qualify as competent evidence.

■ Concerning credibility, SHAB noted that the zoning board appeared to base its conclusion exclusively on a host of potential variables that counsel raised during the cross-examination of East Bay's expert that, if true, may have affected the results of the traffic study. Yet, SHAB found that the record could not substantiate the actual existence of any one of those variables during the course of the traffic study. Based on its own evaluation, SHAB highlighted "the unrefuted evidence in the record that the Site is not located at a dangerous intersection." Indeed, the record indicates that the intersection of Washington Road and Bay Spring Avenue saw only five accidents over a three-year period, and that the development as proposed would generate only twenty-nine to thirty-eight extra trips during peak hours. Moreover, SHAB pointed out that counsel conceded at oral arguments before SHAB that the previous traffic study, which the zoning board referred to and relied on in its second sub-finding to finding number six, was seven years old and had no application.[21]

---

**21.** We also reject the town's argument on appeal that, notwithstanding SHAB's statutorily required standard of review, this Court ought to defer to the zoning board's credibility determinations. We already have articulat-
ed in *Omni Development Corp.*, 814 A.2d at 898, that this Court reviews *SHAB's findings* when an aggrieved party, whether municipality or applicant, has appealed pursuant to § 45–53–5. On appeal, our standard neither

## 2. Fire Safety

 The zoning board bifurcated its findings related to fire safety under two grounds provided in § 45–53–4, similar to its concerns over traffic discussed above. In a sub-finding to finding number nine, the zoning board found that East Bay "failed to show project would meet local needs" because, along with extant safety issues concerning traffic, "[s]afety of Town residents because of fire safety." The zoning board expanded upon its conclusion in a third sub-finding to finding number six, in which it found: "[t]he plan as designed failed to meet certain fire code requirements for 17 units as to access as described in the Fire Chief's letter. The proposed road would be a race track shaped oval * * * which is not safe for a family residential neighborhood."

Searching the record, SHAB found that the zoning board apparently relied on the testimony of Fire Chief Gerald Bessette (fire chief) during a hearing on January 12, 2004, the applicable portions of which are as follows:

"Based on this 2004 edition of the [fire safety code] * * * [a]s I reviewed the plans, I noticed at least on two occasions where the fire apparatus would not be given at least a 20 foot fire lane as required * * *. If I had to use the driveways, I scaled them just, you know, with an architectural scale, I scaled around 15 feet. I am not exactly sure what they are, but [the fire safety code] requires the fire lanes to be at least 20 foot in width. So I found at least two dwelling units that would not meet that first 50–foot requirement to get to an entrance.

"As I reviewed it again, I recognized that there was more than one entrance to almost all of the buildings * * *. Nine, ten, or 11 or 12 of the buildings do not have access to both entrances within 50 feet. * * *

"The next requirement is that the Fire Department be allowed access circumferentially around a building within 150 feet * * *.

"Those are the two major issues that I found, plus the turning radiuses for the apparatus * * * [which] has an 80–foot diameter.

" * * *

"So those are the three major issues: The 50 foot availability to an entrance to the buildings; the 150 feet entirely around the structure; and then the turning radiuses for the apparatus * * *."

The gravamen of SHAB's disquiet with the fire chief's testimony revolved around timing. SHAB began by noting that, as a premise to his remarks, the fire chief explained that he had evaluated the plans under two provisions of the Rhode Island "Fire Safety Code" (fire safety code),[22] scheduled to become effective on January 1, 2004. *See* G.L.1956 § 23–28.1–2. The possible impact of requirements not even in effect, SHAB found, "hardly constitutes a sound basis to conclude that fire safety was inadequate." Moreover, the fire chief had applied those provisions of the fire safety code based on his own inexact scaling of East Bay's proposed plans, admit-

permits this Court to conduct the same extensive examination of the record that the act requires of SHAB nor to bypass SHAB's assessment of the record in favor of the zoning board's leanings.

**22.** *See* G.L. 1956 chapters 28.1 through 28.39 of title 23. The fire safety code is Rhode Island's adaptation of the Uniform Fire Code of the National Fire Protection Association, Inc., which colloquially is referred to as "NFPA 1." *See* § 23–28.1–2.

ting that he was "not exactly sure what [the precise measurements] are."

Even if it were appropriate for the zoning board to invoke incipient provisions of the fire safety code, SHAB continued, the attachment of a condition requiring compliance with the applicable provisions of the code effectively would have addressed the zoning board's concerns. Indeed, in response to a question about the applicability of the new fire safety code to East Bay's application, the fire chief responded: "[m]y review will be based on *when a building permit is obtained.*" (Emphasis added.) Further, the fire chief went on to qualify his statements with reference to the established procedure for addressing fire safety issues, indicating that East Bay's application:

> "[did] not appear to be in compliance [with the fire safety code], but I must add that any review that the Fire Department does is appealable to the Fire Board of Appeal and Review for all Fire Code applications. So if I am not to agree to a particular drawing or plan, that plan would still be—have the opportunity to go before the Board of Appeal and Review at the state level for a variance."

Based on the fire chief's own testimony, and the zoning board's practice over the years of issuing approvals subject to conditions, SHAB noted in conclusion that the zoning board's failure to conditionally approve the application "strongly suggests that this affordable housing project was treated in a disparate manner from other projects."

### 3. Density

██ The zoning board's only finding with respect to density, listed as a subfinding to finding number nine, provided as follows:

> "The density of the proposed development is significantly greater than the surrounding neighborhood and there is not enough open space for the number of units being proposed. These circumstances would alter the character of the surrounding residential neighborhood, and as a result, the proposed development does not promote better site and building design in relation to the surrounding area."

In reaching its conclusion that Sweetbriar grossly would exceed the density levels of the surrounding area, the zoning board apparently relied upon a report submitted by Andrew Lachowicz, a planning and zoning consultant whom the town hired. Mr. Lachowicz's report included an empirical interpretation of the surrounding area that led him to conclude that Sweetbriar would not "promote better site and building design in relation to the surroundings." Mr. Lachowicz arrived at this conclusion, as he testified before the zoning board, based on his own density calculations derived from applicable zoning regulations. As Mr. Lachowicz explained in his report, net residential density is calculated by dividing the number of dwelling units by the "site area." "Site area" is the total parcel acreage of the site, less the acreage on which building is prohibited or otherwise inappropriate. Compared with the average net density of 4.356 dwelling units per acre for the surrounding neighborhoods, Mr. Lachowicz calculated that the net residential density of Sweetbriar would be approximately 8.35 dwelling units per acre—a figure representing about a 100 percent increase.

SHAB took issue with the vague guidance the town's zoning regulations provide for density calculations. Principally, the manner in which "site area" is determined is largely discretionary because the regulations do not explicitly delineate what areas

must be excluded from total parcel acreage.[23] Based on these generalities, Mr. Lachowicz conceded on cross-examination that:

> "The Barrington regulations are by no means as specific as some regulations that I have worked with or written in other communities. Many communities are very specific in that they exactly spell out what may be counted toward a [site] area, what may be counted in calculating density. The Barrington regulations are more general in that they give the Planning Board the authority to make that determination on a—I guess on a case-by-case basis."

The town's counsel confirmed at the hearing before SHAB that the town's density regulations grant a planning board, or a zoning board in the case of an application filed under the act, remarkable flexibility in determining "site area." This discretion can result in divergent density ratings for the same site depending upon the variables employed in calculating the formula's denominator.

Based on its reasoned findings, SHAB concluded that the development would not have a negative impact on traffic safety, did not exhibit fire risks that could not be adequately addressed at the building permit stage, was not excessively dense, and that the zoning board unreasonably found otherwise. We are satisfied that, under our standard of review, SHAB did not make its determination in excess of statutory authority; nor was it clearly erroneous or otherwise arbitrary or capricious.

Accordingly, we affirm the decision of SHAB.

## IV
## Conclusion and Remand

We are mindful of the significant impact that a project of this scope is likely to have on the town and of the legitimate concerns the town retains with respect to issues of health, safety, and environmental protection. We also recognize the serious implications of the act with respect to traditional concepts of local autonomy in land-use decisions. Nevertheless, the zoning board is constrained, as are we, by the statute and our precedents interpreting the same. We take this opportunity, therefore, to discuss the zoning board's authority under the pre-amendment version of the act now that we have concluded that SHAB was correct when it determined that the zoning board wrongfully denied East Bay's application.

■ We begin by observing the particular courses of action SHAB is required to undertake once it has determined that a decision of a zoning board is not consistent with local needs. For example:

> "If [SHAB] finds, in the case of an approval with conditions and requirements imposed, that the decision of the zoning board of review makes the building or operation of the housing infeasible, and is not consistent with local needs, it shall issue a decision and order, *modifying or removing any condition or requirement* so as to make the proposal no longer infeasible, and approving the application * * *."[24] Section 45–53–6(c). (Emphasis added.)

23. For example, in a district that permits housing for the elderly, Art. XXI, § 185–138 of the town's zoning regulations excludes "areas such as wetlands, marshes, water bodies and others, or driveways, parking areas or accessory structures" from site area. Section 185–125 of article XX, pertaining to density

requirements in single-family cluster residential districts, excludes "any sensitive, fragile or environmentally significant areas * * * such as but not limited to wetlands, marshes and water bodies."

24. The corresponding section of the current act, § 45–53–6(d), as amended by P.L. 2005,

Thus, although SHAB is required to issue a decision and order approving the application, the act authorizes SHAB to shape the terms of the approval by modifying or removing the conditions that the zoning board imposed. However, the degree of flexibility permitted in appeals from approvals with conditions is conspicuously absent in appeals from denials. *See* § 45–53–6(c). In situations involving the latter, as in the instant case, § 45–53–6(c) reads that SHAB, once it has found that the zoning board's decision was unreasonable and not consistent with local needs, "shall vacate the decision and issue a decision and order approving the application."[25]

In situations in which a zoning board wrongfully has denied an otherwise estimable application, SHAB is obliged to order the approval itself as a surrogate of the zoning board. To its disadvantage, however, it is not possible for SHAB to know with particularity the conditions a zoning board would have attached to an approval. Indeed, it would be a rare situation in which a zoning board that had denied an application outright in the first place now would not lament over the lost opportunity to impose at least some defensible conditions, the necessity for which only hindsight has revealed. But from the perspective of a zoning board denying an application without foresight into how SHAB ultimately will rule, the formulation of conditions is uneconomical—and, regardless, not required by § 45–53–4. Moreover, the act specifically vests a zoning board with "the same power to issue permits or approvals that any local board or official who would otherwise act with respect to the application, including, but not limited to, the power to attach to the permit or approval, conditions, and requirements with respect to height, site plan, size, or shape, or building materials, as are consistent with the terms of this section."[26] Section 45–53–4. We do not read the pre-amendment version of the act as prohibiting a zoning board from imposing conditions and requirements on remand, provided that they do not, thereby, make the building or operation of the housing infeasible.[27]

---

ch. 297, § 3, similarly provides, in pertinent part:

"If [SHAB] finds, in the case of an approval with conditions and requirements imposed, that the decision of the local review board makes the building or operation of the housing infeasible, and/or the conditions and requirements are not consistent with an approved affordable housing plan, or if the town does not have an approved affordable housing plan, are not consistent with local needs, it shall issue a decision and order, modifying or removing any condition or requirement so as to make the proposal no longer infeasible and/or consistent, and approving the application * * *."

**25.** We note that § 45–53–6(d) now affords SHAB the flexibility in appeals from denials that the pre-amendment version of the act did not. Under the current act,

"If [SHAB] finds, in the case of a denial, that the decision of the local review board was not consistent with an approved affordable housing plan, or if the town does not have an approved affordable housing plan, was not reasonable and consistent with local needs, it shall vacate the decision and issue a decision and order approving the application, denying the application, or approving with various conditions consistent with local needs." Section 45–53–6(d).

**26.** The same language appears in the current version of the act in § 45–53–4(a)(4)(vi), as amended by P.L. 2005, ch. 297, § 3.

**27.** Because SHAB applied the pre-amendment version of the act in its review of the town's denial of East Bay's application, and because SHAB did not have the benefit of the amended language in § 45–53–6(d), we are of the opinion that, in the circumstances of this case, the zoning board is best suited to address any extant issues of health, safety, and environmental protection on remand. We observe, however, that under the current version of the act, SHAB is authorized to impose

The authority to attach conditions and requirements, however, should not be deemed an opportunity for unnecessary delay. The zoning board must grant the application for a comprehensive permit in accordance with the decision of SHAB, which we uphold today. We expect the zoning board to address issues of health, safety, and environmental protection expeditiously and in good faith with a view toward approving the project subject to such reasonable conditions and requirements as it may deem appropriate.[28] We also observe that the ability to impose such conditions at this stage of the proceedings should not be construed as an invitation—absent agreement of the parties—to supplement the record or reopen the hearings.

Accordingly, we affirm the decision of SHAB, to which we return the papers. We further direct the zoning board to carry out the decision and order of SHAB, subject to such conditions and requirements relating to health, safety, and environmental protection as the zoning board may promptly impose consistent with the act, the decision of SHAB, and this opinion.

conditions, provided that they are consistent with local needs. Section 45–53–6(d). For the purposes of deciding this appeal, we need not, and therefore do not, address any residual authority to impose conditions on remand that a zoning board may retain under the current version of the act.

28. We note, for example, that the zoning board's original findings included a finding that "[t]he proposed road would be a race track shaped oval * * * which is not safe for a family residential neighborhood." On remand, the zoning board may wish to review this aspect of the design in an effort to abate any such safety hazards.